# CHARLESTON.

## HEAVNER *v.* MORGAN.

Submitted June 15, 1887.—Decided November 12, 1887.

1. VENDOR AND VENDEE—SPECIFIC PERFORMANCE—DEFECT IN TITLE PURCHASE-MONEY.

Equity will not require a vendee, who has purchased by writing requiring deed of general warranty, to pay all the purchase-money, when a part of the land sold is claimed by others, and the title thereto is defective. If the purchaser can show clearly that the title is defective, equity will not require him to pay the purchase-money until such defect is removed, or a proper abatement is decreed, if the vendee insists on having as much as he can have under good title. (p. 345.)

2. VENDOR AND VENDEE—SPECIFIC PERFORMANCE—PURCHASE-MONEY.

Where a vendor files his bill to subject land for the payment of the purchase-money, and the vendee answers and says that several

portions of the land are held by others, naming them, by title paramount, and shows, in his answer, that the grounds on which such third persons claim portions of said land are such as will put a reasonable man in just apprehension of losing his land, the plaintiff, if he does not concede this, must amend his bill, and set out specifically all the facts within his knowledge with reference to the claim of such third parties; and if he insists his own title is good, and the land is his, then he must make such third parties whose claims he disputes defendants to the bill, so that a proper decree may be entered, protecting the rights of all parties interested. (p. 346.)

*C. C. Higginbotham* for appellant.

*A. M. Poundstone* for appellee.

JOHNSON, PRESIDENT :

On the sixth day of April, 1854, John McWhorter and Alexander S. Withers and wife conveyed to Leonard Crites "all the following-described tract or parcel of land, lying and being in the county of Upshur, being lot No. 14, the division of a tract of thirty thousand acres sold as delinquent and forfeited in the county of Lewis, by commissioners of delinquent and forfeited land for said county of Lewis, as forfeited in the names of John Davenport and others, as by the plat, constituting part of the record in said cause, in the clerk's office of the Circuit Court of Lewis county, will more fully and at large appear; the said lot No. 14 containing one thousand acres, more or less." Leonard Crites, by the third clause of his will, dated July 25, 1866, and admitted to probate on the thirteenth day of April, 1869, "devised to his sons John D. Crites and William M. Crites all the lands lying on the east side of Buckhannon river, improved and unimproved, each having an equal interest therein." By the fourth clause of said will, he "devised to Joseph Crites, Abraham Crites, Mary Crites, Catherine Crites, and Rebecca Crites the residue of the unsold lands on the west side of Buckhannon river; each having an equal interest therein." On the eighth day of September, 1870, John D. Crites and wife, William M. Crites and wife, Elizabeth Crites, widow of Leonard Crites, and Mary Crites, Catherine Crites, and Rebecca Crites conveyed, by deed of that date, to Thomas Selby, "all that certain piece or parcel of land situated in

the said county of Upshur and State of West Virginia, on the east bank of the Buckhannon river, and bounded and described as follows, to-wit," etc. The metes and bounds are set out. The deed continues : "Containing two hundred and three acres, be the same more or less; it being the same land devised to John D. Crites and William M. Crites by the last will and testament of Leonard Crites, deceased."

In a chancery suit in the name of *H. B. Clark* against *Thomas Selby and others,* the said land was sold, and purchased by W. G. L. Totten, to whom the sale was confirmed; and C. C. Higginbotham, the special commissioner appointed for the purpose, conveyed the same to him by the same metes and bounds as are in the deed from the devisees of Leonard Crites to said Selby. By written contract, executed on the fourteenth day of October, 1874, for the consideration of $2,500.00,—$500.00 cash; $416.66⅔ costs to be paid on the fourteenth day of April, 1875; $604.16⅔ on the fourteenth October, 1875; $604.16⅔ on the fourteenth day of April, 1876; and $325.00 on the fourteenth day of October, 1876,—the said W. G. L. Totten sold said tract of land to Morgan Morgan, describing it as "a tract or parcel of land situated in Upshur county, West Virginia, on the right hand fork of the Buckhannon river, adjoining lands of James Ross, Abraham Crites, Jacob Crites, and others, and the same tract of land conveyed by John Crites and other heirs of Leonard Crites, deceased, to Thomas Selby, and this day sold by C. C. Higginbotham, commissioner in the chancery cause of *H. B. Clark* against *Thomas Selby and others,* in the County Court of Upshur county, to the said W. G. L. Totten; containing two hundred and three acres. And the said W. G. L. Totten hereby binds himself to execute to the said Morgan Morgan a deed for said tract of land, on the fourteenth day of April, 1876, with covenants of general warranty." All the purchase-money was paid except the last note of $325.00, which was dated October 14, 1874, due two years after date, with interest from the date. On October 14, 1875, the said Totten, for value received, assigned the said note to Elias Heavner.

Elias Heavner filed his bill in the Circuit Court of Upshur county, in which he set out these facts. He exhib-

43

ited the contract from Totten to Morgan, the unpaid note for purchase-money, the assignment thereof to himself; also the fact that, in pursuance of the contract, Totten, on the twenty seventh day of January, 1881, executed a deed with general warranty to said Morgan for said land, and acknowledged the same for record, but that Morgan refused to accept it, and tenders the deed as an exhibit with his bill. He further alleges that the said tract of land contains 203 acres. The plaintiff prayed for a specific performance of said contract, and that said land might be sold, and the proceeds applied to the payment of the unpaid purchase-money. The said Morgan and Totten were made defendants to the bill. Morgan answered the bill, admitting the sale, exhibited the contract; and further said: "That an exact quantity of land is specified in said contract, as sold to him, to-wit, 203 acres. * * * That said Totten did not, in said written contract, gives metes and bounds to lands sold to defendant, but described the same as adjoining lands of James Ross, Abraham Crites, Jacob Crites, and others, and the same tract of land conveyed by John D. Crites and others, heirs of Leonard Crites, deceased, to Thomas Selby. Said land, when so conveyed to Selby, was not surveyed. * * * That all the bonds or notes made to him by said Totten, specified in said contract, have been paid, except the bond for $325.00. * * * That, something more than a year after said purchase, defendant learned that there were not 203 acres of land in the tract so sold to him by said Totten; that a part of the land embraced in said contract was owned by James Ross, and part by Mrs. Ely,—and, as soon as defendant learned said fact, he so informed said Totten. At first, said Totten claimed that all the land he sold to said defendant he owned, but afterwards admitted that Mrs. Ely and James Ross would hold those parts claimed by them, which had been embraced in said contract; and therefore said Totten made an effort to purchase said parts from said Ross and D. D. T. Farnsworth, agent of Mrs. Ely, but failed to do so, and has not purchased the same.

Deducting the portions embraced in said contract (and also embraced in the deed filed by the plaintiff with his bill as Exhibit C) claimed and owned by Mrs. Ely and said Ross, defend-

ant alleges there is a deficiency in the quantity of said 203 acres. Instead of 203 acres, there are only 167 acres and 48 square poles; making a deficiency of 35 acres and 112 square poles. Defendant says he has already paid and overpaid for the true quantity of land so sold to him by said Totten, and has overpaid the same, to-wit, $——, and is entitled to recover the same from him; and is entitled in this suit, as against the plaintiff, to have said bond for $325.00 canceled. * * * That he refused, and herein refuses, to receive the deed filed with plaintiff's bill, * * * for the reason that the metes and bounds thereof embrace lands which were not owned by said Totten at the time of said sale. Defendant prays that the true quantity so owned by said Totten, and the metes and bounds thereof, be ascertained by proper proceedings herein, and that a deed be required herein from said Totten to defendant setting forth and embracing the true quantity, and the true metes and bounds, of said land so owned by said Totten at the time of his sale to defendant."

On the eighteenth day of February the court entered an order referring the cause to a commissioner to ascertain and report what amount of purchase-money in the bill mentioned has been paid on the land therein mentioned, and to whom; to ascertain and report whether the deed filed with the bill as Exhibit C embraces land not owned by the defendant W. G. L. Totten at the time of his sale to defendant Morgan Morgan; to ascertain and report, further, the true quantity of land owned by said Totten in the tract sold by him to Morgan Morgan; * * * and to ascertain the true metes and bounds thereof. And to this end the commissioner may direct the surveyor of lands of this county to go on said land, and land contiguous thereto, and do such surveying * * * as any of the parties in this suit may require, with the view of ascertaining the true quantity and boundary of said land; and for this purpose said surveyor shall, if required by any of the parties to this suit, go to the beginning corner of what is known as the 'Davenport Survey,' and any other of the corners and lines thereof, and do such surveying * * * as may be required, etc.

The surveyor did go on the land, and, under the instructions given him, did his work thoroughly. His map shows the Dav-

enport survey, and how different lots are located with reference to each other. The black lines bounding lot 14 show the original survey of that lot, and its relation in the block to the surrounding lots. The evidence shows that after Crites had bought lot 14, by the description of "Lot 14 in the Davenport Survey," he, in 1859, had it surveyed by one Aaron D. Peterson, who commenced at a mistaken corner of lot 14, and surveyed the same, as he supposed. Lot 14 is bounded on the top or north by lot 13, on the right or east by lot 23, on the bottom or south by lot 15, and on the left or west by lot 11. On the north, in the block of lots, on the east of 13 is 24, and on the west is 12. By Peterson's survey, commencing, as he did, at what he evidently supposed was a corner of lot 14 in the Davenport survey, he left out a small strip of land on the south, which went into 15; also left out a strip on the west, which went into 11; and took a part of lot 13 on the north, and thus created an interlock. He also included a part of lot 23, amounting to, as far as this controversy is concerned, 26½ acres, which creates another interlock; and also included two acres of lot 24, making still another interlock. James Ross is the owner of that portion of lot 13 which adjoins 14, and Mrs. Ely owns lot 23 on the east. Thus there are made three interlocks. It does not appear who owns lot 24, on which the interlock of the two acres is made. On that portion included in the deed to Totten, and from Totten to Morgan, the interlock with Ross's land makes 23½ acres; and that with Mrs. Ely's land, 26½ acres; and with lot 24, 2 acres.

The proof shows that Leonard Crites built a house, in about 1850, in the interlock on the north with James Ross's land, and cleared within that interlock 14 acres, which has been held by Crites, and those claiming under him, continuously from that time to this. There was no improvement, so far as the proof shows, in the two-acre interlock, or the 26½ acre interlock on the land of Mrs. Ely. Neither Mrs. Ely, James Ross, nor the owner of lot 24 are defendants to the suit. There is considerable conflict of evidence as to the relative value of the land in the interlocks to the whole land sold. The court, being of opinion that the adverse holding could only include the actual inclosure, held that Morgan

could hold the 14 acres improved land, with house thereon, but that he could not hold the 9½, the 2, and the 26½ acres; and decided that the value of said lands must be abated from the purchase-money, and that such value amounted to more than the purchase-money due; and dismissed the bill as to Morgan, with costs, and decreed over in favor of J. W. Heavner, executor of Elias Heavner, deceased, against Totten for the note with interest and costs; and that Totten should execute a deed to Morgan Morgan, as therein directed, which would leave out the said interlock, and run by the black lines, which were the lines of the Davenport survey, except that it should include the 14 acres, so held by prescription. From this decree the executor of Elias Heavner appealed.

It is very clear that if it were proper in this cause to make any decree at all, without other parties before the court, that Morgan would hold the residue of the interlock as against Ross, as well as the 14 acres, because that 9½ acres was the residue of the interlock; the party holding actual possession *within* the interlock of the 14 acres, and claiming to the extent of his boundary. In *Garrett* v. *Ramsey*, 26 W. Va. 345, a majority of this Court held that where there are conflicting grants or deeds to lands, causing an interlock, and the elder grantee or owner is in the actual possession of his land outside of the interlock, and the junior grantee or adverse claimant is in the actual possession of a part of the interlock, claiming the whole, to the extent of his boundary, such possession of the former outside of the interlock will not limit the possession of the latter to his mere inclosure, but he will be held to be in the adverse possession of all the land in the interlock. The court, also, in a case like this, where it is a question of whether the party had *title* to a part of the land he sold, and the defendant claims an abatement for the loss of land to which he can not have title, will not fix the average value per acre of the entire tract sold as the rule for abatement, as was held in *Depue* v. *Sergent*, 21 W. Va. 326, where there was no question of title, but a deficiency in the quantity of acres, but, in a case like this, the measure of abatement is such portion of the purchase-price as the relative value of the land lost bears to the purchase-price of the whole land. *Butcher* v. *Peterson*, 26 W. Va. 447.

Should the owner of adjoining lands, where the interlocks occurred, have been before the court before a decree was rendered?

In *Yancey* v. *Lewis*, 4 Hen. & M. 390, it was held that where a purchaser comes into a court of equity for relief against a judgment at law, on the ground of defect in the vendor's title to a part of the tract of land purchased, it is not enough for him to allege such defect as want of title; he must *prove* an actual eviction, or superior title in some other person. In this case, the defect claimed was in not having a patent for part of the land.

In *Ralston* v. *Miller*, 3 Rand. (Va.) 44, it was held that a court of equity will not interfere to prevent the payment of purchase-money of lands, unless the title to the land is questioned by a suit, either prosecuted or threatened, or unless the purchaser can show clearly that the title is defective. In this case, it does not appear that Davidson, who claimed title to a part of the lot, was made a defendant. Nothing was said in the opinion about parties.

In *Koger* v. *Kane's adm'r*, 5 Leigh 606, it was held that the jurisdiction of a court of equity to enjoin the purchase-money of land after conveyance, executed on the ground of *deficiency in* quantity, the contract being a sale by the acre, is not now to be questioned; and in Virginia equity will enjoin the collection of the purchase-money of land, on the grounds of *defect of title*, after the vendee has taken possession under conveyance from the vendor, with general warranty, if the title is questioned by a suit, either prosecuted or threatened, or if the purchaser can show clearly that the title is defective. There is no statement of the case, and it does not appear whether the party who claimed a part of the land against the purchaser was, or was not, a party. Tucker, J., in his opinion, says: " In England, if the purchaser has obtained his deed, he can have no redress in equity, but must look to his covenants; and, if he has but a covenant of warranty, he can have no redress until eviction. And this principle has received countenance from the decisions of the court of a sister State. *Bumpus* v. *Planter*, 1 Johns. Ch. 213, 218; *Abbott* v. *Allen*, 2 Johns. Ch. 519. But with us, even at a time when there was most rigor in this matter, it was ad-

mitted that the party might have relief, provided he could prove an outstanding superior title in a third person. *Yancey* v. *Lewis*, 4 Hen. & M. 390; *Grantland* v. *Wright*, 5 Munf. 295. And in *Ralston* v. *Miller*, 3 Rand. (Va.) 44, Judge Green, delivering the opinion, in which the other judges concurred, remarks that this Court has, in favor of purchasers, gone far beyond anything which has been sustained by the court of chancery of England or elsewhere in enjoining the payment of purchase-money after the purchaser has taken possession under a conveyance, especially with general warranty. Yet it has never gone so far as to interfere, unless the title was questioned by a suit, either prosecuted or threatened, *or unless the purchaser could show clearly that the title was defective.* Chancellor Kent seems to have deemed an actual suit pending as sufficient grounds of interference. *Johnson* v. *Gere*, 2 Johns. Ch. 546. The jurisdiction thus confessedly exercised by the courts of equity with us results from what may be called the preventive justice of these tribunals. It arrests the compulsive payment of the purchase-money when the purchaser can show that there is either a certainty or strong probability that he must lose that for which he is paying his money. It gives him the relief, too, though his demand may be in the nature of unliquidated damages, because he has no other means of ascertaining them. Thus, if the purchaser can show that he has received a deed with general warranty, and that the title is bad, yet, if he has not been evicted, he can not maintain covenant at law, and ascertain his damages before that tribunal, in order there to set them off against the demand. If, indeed, there are covenants for good title, etc., it may be otherwise; and so it may often happen that an action may be brought, where there are such covenants of good title, etc., upon which the validity of the title may be tested, and the damages of the party ascertained. Whether, in these causes, relief could be given in equity, it is not necessary here to say. But, where there is only a covenant of warranty, this can not be done; and hence I conceive the party would be entitled to the assistance of a court of equity where he is full-handed with proof that his title is defective, although he has not yet been evicted."

In *Clarke* v. *Hardgrove*, 7 Gratt. 399, it was held that

where H. sells land to O. and conveys to him with general warranty, and O. assigns to H. the bonds of S. in payment of the purchase-money; and the title to a part of the land is afterwards discovered to be clearly defective,—that O. may enjoin H. from collecting so much of the bond of S. as will compensate him for the land to which the title is defective; that O. is entitled to compensation according to the relative value of the land to which a good title can not be made. The sale was of 1,176 acres of land for $11,000.00. The bill alleges that when the purchaser bought the land, and received his deed, he did not know there was any defect in the title to any part of it; that Hardgrove or his vendees never had title to 51 acres of the land; that the 51 acres was situated in the middle of the tract; that it had been owned by P. Goodwin, who, 20 years before, had devised it to his two daughters, one of whom had married Thomas Whitworth, and the other had married Daniel E. Allen, and had died, leaving an infant daughter. The bill made Allen and his infant daughter, Whitworth and wife, Hardgrave, Scott and his sureties, and others, parties to the bill. No question was here raised as to the parties.

*Lovell* v. *Chilton*, 2 W. Va. 410, was an injunction to restrain collection of purchase-money on account of defect in the title to a part of the land; and John O. Bird, who claimed a part of the land, was made a defendant. Maxwell, judge, in delivering the opinion of the Court, said that "It seems to me, therefore, that the complainant thus made out a case showing clearly that Chilton's title was defective, and was entitled to have the sale of the land injoined until the title could be settled. *Keyton's Adm'x.* v. *Brawford's Ex'rs*, 5 Leigh 39; *Ralston* v. *Miller*, 3 Rand. (Va.) 44. But I think the release of Bird of all his title to said land, which Chilton procured and had recorded, was a sufficient settlement of the title to allow the complainant to proceed to collect the purchase-money by sale of the land. There is another charge in the bill,—that the complainant was informed and believed that there were other parties who claimed the land described in Chilton's deed to him, adversely to him; but there is no allegation who the parties are, nor is their title shown or indicated. This allegation is entirely too general to require any attention."

In *Wamsley* v. *Stalnaker*, 24 W. Va. 214, it is again held that equity will enjoin the collection of the purchase-money of land on the ground of defect of title after the vendee has taken possession under conveyance from the vendor, with general warranty, if the title is questioned by a suit, either prosecuted or threatened, or if the purchaser can show clearly that the title is defective. In this case, the injunction was granted, on the ground that there were various liens on the lands when the purchaser bought.

In *Kinport* v. *Rawson*, 2 S. E. Rep. 85, this Court held the same as in 24 W. Va., just cited; but held, further, that by the words "if the title is questioned by a suit, either prosecuted or threatened," is not meant that it is sufficient to allege in the bill that a "suit is threatened," merely, but the bill on its face must allege the grounds upon which the "threatened suit" is based, and which must be such as will put a reasonable man in just apprehension of the loss of his land. It was further held, in this cause, in which the bill alleged that Holt and Mathews asserted a claim on the land, that the mere fact that some one has asserted a claim on the land, and the fact was generally known in the community where the land is situated, is insufficient to justify a court of equity in restraining a sale under a trust deed given to secure the purchase-money. Holt and Mathews were made defendants to the bill. Nothing was said in the cause about parties.

Now, in such causes, should the persons who the bill states hold parts of the land by title paramount to that of the vendor be made parties defendant, and bound by the decree? Judge Tucker, as we have seen, in *Koger* v. *Kane's Adm'r*, 5 Leigh 608, justifies the departure from the strict rule of the English chancery court, on the ground that it results from what may be called the preventive justice of a court of equity; that, where there is simply a convenant of general warranty, the purchaser ought not to be compelled to pay the purchase-money, when he is full handed with proof that the title is defective. If he is thus to be favored, it is because it would be inequitable that he should pay his purchase-money for a thing he can not receive. But where is the equity in requiring him, on a case made, to pay his

money, and take title to land that is claimed by a third party, when the very next day that third party may sue him in ejectment for the same land, and on the case then made he loses his land? Equity delights in doing ample and complete justice to all parties; and requires that a third party, claiming to hold the land against the purchaser, should be made a party, and required to show his title and claim, and to be bound by the decree. Justice, it seems to me, requires this.

In this cause, the court has decided that Morgan should hold 14 acres of land, because it has been held in possession so long by the vendor, and those under whom he claimed, that he had a title by prescription. Ross was not a party to the suit, and of course is not bound by the decree. He may sue Morgan in ejectment, and recover that 14 acres, by showing that Crites entered under a lease, and always recognized the right of the owner of lot 13. It is not treating Morgan justly to make him take such a hazard. All the parties are interested in the controversy, and it ought to be settled in one suit, so as to prevent litigation, and do justice between the parties. Ross ought to have been made a defendant; and, unless Heavner will give up all claims to the other two interlocks, Mrs. Ely and the owner of lot 24 ought also to be made defendants. When a suit is brought to enforce a vendor's lien, and the answer resists the payment of the purchase-money, on the ground that certain portions of the land are claimed and held by certain persons by paramount title, unless such answer shows on its face that *prima facie* the title is defective, it is not sufficient; but, if it does show this, the plaintiff can not reply specially, but must amend his bill, and make all such parties who set up such *bona fide* claims defendants to his bill, and show by his bill, if he can, that his title is clear and valid, and that there is no defect in the title. If he does not intend to insist on title, as against the defendants, or any of them, who are claiming the land, or a part thereof, as shown by the answer, let him say so in his bill, and he need not make such parties defendants; but he will not be permitted to require the defendant, who is the purchaser, to pay for any land to which the said third party appears to have had a good title, but which the court thinks has been lost by adverse possession, unless such third party

is a defendant to the suit. If the claim of such third party to the land sold to the vendee is based on such grounds as will put a reasonable man in just apprehension of losing his land, such claimant should be made a defendant to the suit.

The decree of the Circuit Court of Upshur county is reversed, with costs, and the cause remanded, with leave to the plaintiff to amend his bill as herein indicated, and for further proceedings according to this opinion and the rules of equity.

REVERSED. REMANDED.