# CHARLESTON.

SMITH v. PARSONS et al.

Submitted January 15, 1890—Decided March 3, 1890.

1. VENDOR AND VENDEE—WARRANTY—TITLE.

Though a sale of land be made with covenant of general warranty, yet the purchaser can not claim against the vendor for costs expended by the purchaser in defence of a suit by an adverse claimant of the land, which suit resulted in favor of the purchaser and the title which he acquired by his purchase.

2. VENDOR AND VENDEE — PURCHASE-MONEY — TITLE — ABATEMENT.

Where there is a sale of land under an executory agreement providing for a conveyance with general warranty, and a portion of the land is, at the time of the sale, in the actual possession of an adverse claimant, and the purchaser buys the land held by such adverse claimant, and the vendor seeks to collect the purchase-money from the purchaser, and the purchaser asks an abatement for the land held by such adverse claimant, and it does not appear whether the title of such adverse claimant is paramount or not, it is error to decree the purchase-money against the purchaser and the land, without allowing any abatement. As doubt is cast upon the title by such possession of the adverse claimant, before decreeing there should be an enquiry by a commissioner to ascertain the character of the title of such adverse claimant.

3. PARTIES—LIENS AND LIENORS.

On a suit to enforce liens for the benefit of all lienholders against the land of a debtor, if it appears necessary to a safe and proper decision between the debtor and any lienholder that such lienholder should be a formal party, the court may and should require him to be made a party, though his debt has been reported as a lien by a commissoner's report made under an order to convene lienholders and report their liens, after publication of notice to them.

*B. L. Butcher* for appellant.

*S. Woods* and *F. Woods* for appellee.

BRANNON, JUDGE:

Job Parsons, Jr., brought a suit in equity in the Circuit Court of Randolph county against Job W. Parsons as the

only defendant, to enforce the lien of a judgment against land of the defendant. Afterwards an amended bill was filed which made additional defendants certain persons who, in the deed conveying to the debtor the land sought to be subjected retained a lien thereon for purchase-money, and also making defendants the trustee and parties secured by a deed of trust given by Job W. Parsons to secure certain endorsers upon a note owned by the Bank of Kingwood, which conveyed the same land. A reference was made to any of the commissioners of the court to ascertain the lands owned by Job W. Parsons, and the title thereto and the liens thereon and directed publication of notice to lienholders. Afterwards there were four reports made by commissioners under this order and orders of recommittal reporting various liens on the land. During the progress of the suit an order was made reciting that the debt of the plaintiff Job Parsons, Jr., had been paid, and it was ordered that the cause proceed in the name of the National Bank of Piedmont as plaintiff, which, as appeared by a commissioner's report, had a judgment against the debtor; and later an order was entered reciting that the debt of the National Bank of Piedmont had been paid and ordering the cause to proceed in the name of Laban P. Smith as plaintiff, he having debts against Parsons reported in said report. An order was made recommending the cause to rules with leave to file an amended bill, but afterwards it was set aside and no further amended bill was filed. To the fourth commissioner's report reporting debts against Parsons he filed exceptions.

An important controversy in this cause relates to a debt reported and decreed in favor of Laban P. Smith against Parsons growing out of a sale made by Smith to Job W. Parsons, by an executory agreement by which Smith sold Parsons his undivided interest in the land in Randolph sought to be sold in this suit for the sum of $2,745.00, and Smith stipulated to convey said interest with covenant of general warranty when the purchase-money should be paid.

Parsons claimed abatements from this debt of Laban P. Smith. One of the abatements was $350.00 for a portion of the expenses incurred by Parsons in defence of an action of ejectment brought by Hoffman's executors and others

against him for the recovery of some of this land, which upon trial resulted in the success of Parsons and the vindication of the title he acquired from Smith. Another abatement claimed was $23.00 for a portion of the expenses in prosecuting an ejectment brought by Parsons against Pennington for thirty nine acres of land which he claimed was included in that sold by Smith to him, and $50.00 for loss of the use of said thirty nine acres, and $150.00 for the loss of the thirty nine acres in the event it should be lost. Another abatement claimed by Parsons was $142.50 for land claimed by the heirs of White.

At this point let us dispose of this controversy as to the debt of Smith against Parsons. Parsons was certainly not entitled to an abatement of $350.00 for costs paid in defending the ejectment suit of Hoffman's executors against him. It is true that Smith in his sale to Parsons stipulated for a conveyance with general warranty, but the ejectment resulted in favor of the title sold by Smith, and showed that it was the paramount title. A covenant of general warranty is not broken until there is an eviction under a paramount title or what is equivalent. *Rex* v. *Creel,* 22 W. Va., 373; 2 Minor's Ins., 643; 2 Lomax Dig., 355; 2 Rob. Prac. (new) 87; 2 Sutherland on Dam., 279; Rawle, Cov. Title, §§ 127, 13 1; *Yancey* v. *Lewis,* 4 Hen. and Munf. 390.

Why, then, should Smith pay costs expended in defending this action? He sold a good and valid title, as shown by the result of the action of ejectment, and did no wrong in so doing, and by no reasonable view can it be claimed that he was to stand good for expenses in defence of assaults by inferior title. He did not warrant that no one should ever sue Parsons for the land, or in any manner bind himself to refund expenses incurred in defending the land against any one who might think he had a valid claim to the land and bring a suit for it. Had Parsons lost the land, then Smith upon his covenant would have been bound for the land lost and costs expended in an unsuccessful defence of the title. *Threlkeld* v. *Fitzhugh,* 2 Leigh 451; 2 Sutherland on Dam. 302; Rawle, Cov. Title, § 197. But the covenantee is clearly not entitled to demand of the covenantor expenses in defending a suit which sustains the title as valid, for the covenant

does not bind for any outlays necessitated by the simple existence or assertion of an adverse claim. The covenant does not protect against any but lawful claims which negative the title that the deed purports to convey. 2 Sutherland on Dam., 308 ; Rawle, Cov. Title, § 201.

The next question is, whether Parsons is entitled to costs paid by him in the ejectment brought by him against Pennington for the thirty nine acres, and for its use, and for its loss should it occur. The record is not clear as to this thirty nine acres. Smith sold Parsons the undivided two thirds of one undivided fourth of the Conrad and Smith tract of 5,606 acres of land, as found by the Commissioner in his last report.

It seems from Kile's deposition that this thirty nine acres lies within this Conrad and Smith survey ; but the title-bond between Laban P. Smith and Job. W. Parsons recites that Smith owned that undivided interest in said land of which Laban Smith died seized as an heir of Laban Smith, except an interest, owned by Parsons under the will of his wife, *nee* Smith, and it is the interest of Laban P. Smith thus described which Smith sold to Parsons. Now, Laban P. Smith did not sell Parsons any land of which Laban Smith did not die seized. Kile says that he understood that this thirty nine acre tract was surveyed by Ullery Conrad and Laban Smith for Geo. M. Summerfield, "but it was never conveyed by them to Summerfield by deed." Parsons himself as a witness was asked whether the thirty nine acres was not the same land sold and surveyed by Smith and Conrad to Pennington or his vendors long before his purchase from L. P. Smith, and whether Pennington did not have possession of it, and whether there was not considerable improvement there at the time of his purchase from Smith ; and he answered as follows : "Yes, I guess so; that is my understanding of it. The improvement was there, but not fenced; it all laid open adjoining our lands. They made some kind of purchase, but they never had a deed or any title that I heard of, more than some kind of a contract. We claimed it and also the fifty seven acres. I guess they had a kind of a title bond from Smith and Conrad —I think they did ; ain't certain of it." From this it seems to me that Laban Smith and Conrad had sold this thirty nine

acres in the lifetime of Laban Smith, and that Laban Smith did not die owner of it, and that Laban P. Smith's title-bond is not to be held as selling this thirty nine acres to Parsons. Commissioner Ward says he disallowed this claim for abatement for the reason that Parsons in his deposition said that the thirty nine acres was sold by Conrad and Smith to Pennington long before his purchase from L. P. Smith, and I think he was correct in so finding.

Parsons also claimed an abatement for land which he says was included in the sale by Smith to him, and which was purchased by him of White, being part of a certain fifty seven acres, and which Parsons claims he was compelled to purchase as an adverse claim. Parsons' deposition is the only one bearing upon this matter. In it he says that Whites claimed this land, built a house on it and lived in it at the time he purchased of Smith, and that this claim cut his cattle from water and he was compelled to buy twenty-five or thirty acres within the Smith sale worth $20.00 an acre to get water for his cattle and save a law suit, and he sought to charge Smith with one sixth of this outlay as proportionate to Smith's interest in the whole tract.

Where at the time of a conveyance with general warranty the land conveyed is in the actual possession of a third party holding adversely under a paramount title, this amounts to an eviction *eo instanti*, and the covenant is broken. *Rex* v. *Creel, supra*, and authorities cited. Here it does not appear what was the character of the claim under which the Whites held, and we can not say it was a paramount title to that sold by Smith to Parsons, and if Smith had made a conveyance of the legal title, the present showing of the case would not warrant us in saying there was anything equivalent to an eviction. But this is the case of an executory contract between Smith and Parsons, by which Parsons was entitled to a clear title before paying the purchase-money. Parsons asked an abatement from the purchase-money on this score, and showed an adverse possession when the sale was made to him. Under this condition was it the duty of Parsons to show that this claim of the Whites was under a paramount claim, or the duty of Smith to show that it was not paramount? Parsons was not bound to accept any but a good title, and

could not be compelled to pay the purchase-money until he received a good title. *Heavner* v. *Morgan*, 30 W. Va. 335. He showed enough to cast doubt upon the title to the extent of the land claimed by White.

In *Griffin* v. *Cunningham*, 19 Gratt. 571, it was held that a vendor seeking specific performance must not only have a good title, but he must show it. Where any doubt arises as to title, the practice in England is to refer it to a master to report upon its sufficiency. Prof. Minor says that in Virginia the practice *tends* in the same direction, and very judiciously. 2 Minor, 810. In *Middleton* v. *Selby*, 19 W. Va., JUDGE PATTON, delivering the Court's opinion, upon a review of the authorities said:

"From the authorities it is clear, that this enquiry (by a commissioner) will be directed upon the application of the vendee, or where the proof in the cause raises a doubt as to the title ; but it does not appear from the authorities where no application is made by the purchaser, nor doubt raised by the proof, that the Court will in all cases direct an enquiry as to the title."

I concur in this exposition of the law. These principles apply to this cause. Either Parsons should have been allowed the abatement, or there should have been an enquiry as to the title. I do not think he should have been allowed the abatement, because though the Whites were in possession at the date of the sale to Parsons, yet it did not appear that their claim was paramount. Such a course might be justified on the theory announced in *Griffin* v. *Cunningham*, *supra*, that as this possession by Whites had been shown, it then became Smith's burden and duty to show the superiority of his title, and thus show that Parsons had imprudently assumed the superiority of the White title by purchasing it. But I think the proper course would have been to direct an enquiry as to the title. I think it was error to overrule this exception of Parsons's.

Parsons excepts to the report because it declares that he forfeited his contract with the Summerlands. A contract was made between Job W. Parsons and Samuel E. and John C. Summerland on 10th November, 1873, whereby Parsons sold Summerland 500,000 feet of cherry lumber to be taken

from Parsons's land in Randolph to be delivered in the log within eighteen months at Rowlesburg, with provision in the contract that if the delivery of the lumber be necessarily delayed on account of insufficient water or rises of water in the streams in which the lumber would have to be floated within said eighteen months, and no wilful failure or neglect on the part of Parsons should occur, Parsons should have the right of delivering the logs after the expiration of said period, providing the delivery be made as soon after the expiration of said period as the condition of the waters would admit by the use of reasonable and proper diligence on the part of Parsons. By the contract the Summerlands agreed to pay $20.00 per thousand feet, or $10,000.00 for the 500,000 feet, payable as follows: $1,500.00 as soon as Parsons and wife should execute to Summerlands a deed of trust upon all Parsons' real estate in Randolph county to secure Summerlands repayment of said $1,500.00, in the event Parsons should fail to deliver the lumber at the time and place stipulated; and $3,500.00 to be paid to Parsons when all of the 500,000 feet of logs should be placed on the bank of the streams, or near enough for easy shipment, provided the repayment of said $3,500.00 to Summerlands should be secured by deed of trust in the same manner by which the repayment of the $1,500.00 was to be secured, in the event Parsons should fail to deliver the lumber as provided in the contract; and the residue of the price was to be paid as soon as final and complete delivery of all the lumber should be made.

The contract contained a further clause to the effect that in the event the party of the first part (Parsons) " shall *wilfully* fail to deliver said lumber as herein provided, he shall be liable to the parties of the second part for legal interest on the money advanced to him in pursuance of this contract from the time it is so advanced until it shall be repaid or refunded to the parties of the second part, but otherwise the party of the first part shall not be liable for interest on the money so advanced; and for such wilful failure upon the part of the party of the first part, should it occur, he shall be liable to said parties of the second part for all proper and legal damages that may be sustained by them."

The commissioners report ascertains that under this contract Summerland advanced to Parsons $1,500.00, for which a deed of trust was executed by Parsons to Leland Kittle, trustee, dated 23d November, 1883, and also $3,500.00 for which Parsons executed to said Kittle a second deed of trust, dated 27th October, 1884. The report treats the contract as forfeited for failure of Parsons to execute it and charges these sums to Parsons, with interest on them from said dates, respectively, crediting him with some lumber delivered, and the court decreed them. That these deeds of trust are liens on the land there is no question. But are they simple liens yet open to be satisfied by the performance of the contract by delivery of the logs by Parsons, or was there such a failure in performance by Parsons as justified the commissioner in reporting the contract forfeited by Parsons, and in reporting said sums of $1,500.00 and $3,500.00 as absolute debts bearing interest from the times when the moneys were advanced?

There is no evidence upon this matter but the deposition of Parsons. He furnished none of this lumber within the eighteen months specified in the contract for its delivery. He furnished in May, 1886, 16,024 feet; in July, 1887, 16,157 feet, and also a further quantity estimated by him at 11,000 feet, and sold to Hinkle, King & Co., and Stockholm Hay & Co., at Rowlesburg, cherry lumber, which Summerland, as I infer from the evidence, without Parsons' consent, claimed as properly belonging to them under their contract as perhaps from their logs, and received from Hinkle, King & Co., 799 feet and from Stockholm, Hay & Co., 18,250 feet. Thus of the 500,000 feet up to July 1887 there was delivered only 62,240 feet. Parsons admits in his deposition that he sold cherry lumber to other parties at Rowlesburg and elsewhere. By reason of this act of selling to others lumber which he should have delivered to Summerlands the commissioner reports the contract as forfeited by Parsons. His deposition shows that he cut and put into the rivers logs enough to fill out the contract, but had not succeeded in getting them to Rowlesburg, but they were scattered at various points in the river on the way to Rowlesburg.

It is a very important question whether under the delays in delivery of logs on the part of Parsons and the continued

reception of lumber by Summerlands down to as late as July 1887, shortly before the making up of the commissioner's report, the contract between Parsons and Summerlands was yet an open contract to be further executed by delivery of logs, or forfeited, and said sums a simple money debt, and we fear that justice might not be done by the decision of this matter in the absence of the Summerlands as formal parties, and therefor have concluded not to decide this question but to require that they shall be made parties by an amended bill.

The Summerlands have not indicated whether they regard or claim the contract as yet subject to be executed by a delivery of the logs, or as forfeited and calling for said sums of $1,500.00 and $3,500.00 with interest simply as debts, unless we should say from the mere fact that they are reported as debts that they claim the contract as forfeited, which would be a mere inference, for it does not appear from the commissioner's report that they themselves presented the debt before the commissioner or made any claim about it. They have asked no relief. If there was cause of forfeiture, they could elect to waive it and hold the contract as yet open. They have made no express election, so far as appears.

It is true that there was an order in the cause directing a convention of lienholders after publication of notice to them, and it is true that in *Norris, Caldwell & Co., v. Bean,* 17, W. Va., 655, it was held that for the failure to make lienors formal parties this Court would not reverse a decree where there was such order and publication, GREEN, P., saying in the opinion that the parties by making no objection in the court below would be held as having waived their right to object thereto in this Court. It is true that in *Billymyer* v. *Sherman,* 23 W. Va. 656, and other cases therein cited it has been held that creditors by filing claims before a commissioner, though not formal parties, become informal parties and are as effectually bound by decrees entered in the suit as if they had been made formal parties by process served on them; and in the opinion by Judge SNYDER this doctrine was held applicable to creditors by deed of trust who appeared and filed their debts.

Generally such a rule is ample to attain the ends of justice and facilitates the administration of justice, especially where the liens are ascertained and definite. But here the question is whether this contract had been forfeited, whether the deeds of trust were to be treated as securing debts bearing interest, and if so, a settlement was to be made between Parsons and Summerlands, all of which was dependent on evidence, and we think the discretion of the court should have required the Summerlands to be made parties and their rights under said deeds and contract to be set up by amendment of the pleadings.

The rule to which I have adverted recognized in *Billymyer* v. *Sherman* is not inexorable. It does not prevent the court from requiring creditors to be made formal parties where, under the circumstances of the case, their presence, in the judgment of the court, is proper. The discretion of a court of equity in this matter is wide; and § 58 ch. 125, Code 1887, provides that, "Whenever in any case a complete determination of the controversy can not be had without the presence of other parties, the court may cause them to be made parties to the action or suit by amendment."

The appellant assigns as error that the decree settles the rights of numerous parties without their being made parties to the cause, not specifying any particular parties. We think the assignment tenable as regards the two Summerlands, but not as to other lienors, for reasons above stated.

At this point I note the fact that Leland Kittle, trustee in the deeds of trust from Parsons to secure Summerlands, is not a party. In *Billmyer* v. *Sherman, supra*, it is held that "where there are liens by trust-deeds, the trustees in such deeds must be made formal parties, before any sale of the debtor's lands can be ordered; such trustees can not be made informal parties by publication; and where a decree of sale is made in the absence of a trustee, this Court will reverse the decree, although the *cestui que trust* had his debt audited in the suit." The reason is that the trustee holds the legal title, and without his presence the court can not acquire control over or sell the land, and consequently cannot confer a legal title on the purchaser. See 23 W. Va. 664. These deeds of trust are later in date than that to Ervin to secure

endorsers upon a note held by the Bank of Kingwood, and Ervin was made a party, and thus no legal title was conferred on Kittle, but only the equity of redemption. The debt secured under the deed of trust to Ervin, trustee, was reported in the first report, and omitted in the last three, perhaps because satisfied, though it does not affirmatively appear that it was satisfied. The deeds of trust to Kittle are not in the record, so that we do not know whether they contain a covenant of general warranty, so as to invest Kittle with the legal title which may have reverted to Parsons from Ervin trustee. He may be an indispensable party holding the title. We can not say certainly as to this; but Kittle should be made a party in connection with the deeds of trust to him in the amendment hereafter to be made.

There is no substance in the assignments of error in the orders of the court substituting the National Bank of Piedmont and afterwards L. P. Smith as plaintiff, the debts of the original plaintiff having been paid, as it was proper to substitute other creditors in their room, transposing them from the position of defendants to that of plaintiffs, as the proceeding was for the benefit of all lienors. *Billymyer* v. *Sherman, supra.* Laban P. Smith should have been required to convey the land which he sold to Parsons, and in default thereof provision should have been made for a deed from him. This decree does not even adjudicate that he is bound so to convey, nor was the court in possession of this deed as an escrow, nor does it provide for one. True, it might in a subsequent decree provide for this; but its omission to do so in the decree of sale might produce sacrifice, and the course pursued in this decree in this matter, if not reversible error, is objectionable.

The decree is erroneous in so far as it overrules Parsons's fifth exception to Commissioner Ward's report for disallowing the abatement from Laban P. Smith's debt on account of the alleged loss of part of the fifty seven acre tract of land, claimed by heirs of Thomas White to the extent above indicated; and it is erroneous in so far as it overrules said Parsons's seventh exception to said report for holding that Parsons forfeited his contract with said Summerland and adjudicates between said Parsons and Summerland

and decrees a debt in favor of said Summerland against the said Parsons, without the presence of Samuel E. Summerland and John C. Summerland, as formal parties to the cause ; and in these respects said decree is reversed with costs to appellant against Laban P. Smith; and the cause is remanded for further proceedings in respect to these matters in accordance with principles herein indicated, and further according to principles of courts of equity. But in all other respects except so far as it directs a sale the said decree is affirmed.

AFFIRMED IN PART. REVERSED IN PART. REMANDED.