# CHARLESTON.

CAPERTON'S ADM'RS *et al v.* CAPERTON'S HEIRS *et al.*

(HOLT, JUDGE, absent.)

Submitted January 26, 1892.—Decided April 13, 1892.

1. VENDOR AND VENDEE—TAXES.

Land is sold by executory contract in 1848, and conveyed absolutely in February, 1850, the vendee executing an obligation to pay a debt due for purchase-money on the land from the vendor, and to sell the land and pay the vendor "one third of the proceeds of said land when realized from any sale or sales thereof." The lands are not sold for thirty four years. No part of the taxes paid by the vendee are chargeable to the vendor.

2. VENDOR AND VENDEE—COSTS—SALES.

Said obligation of the vendor provides that he shall take upon himself the burden of selling the land, and that in payment of the vendor's third there is to be no deduction made from the proportion of said W. (vendor) on account of any expense arising from surveys, or any other expense incident to the sale of said lands. Costs of suits brought by the vendee to clear title, resulting in sustaining the title, are not to be charged to vendor to any extent, especially as it does not appear that the adverse claim existed at the date of sale, or was one for which the vendor, and not the vendee, was responsible. Nor are costs of a suit brought by the vendee's administrators against his heirs and creditors to settle his estate and sell his lands, among them the land aforesaid, to pay his debts, nor commissions to commissioners for selling said land under said decree, nor compensation to a third party by such commissioners made their agent to look after and sell the said land.

3. CONSTRUCTION OF CONTRACT—DECLARATIONS.

If a written contract is on its face ambiguous, the surrounding circumstances, the situation of the parties, and the subject-matter of the contract, and acts done by the parties under it, may be considered as aid in giving it construction, but not the verbal declarations of the parties.

*J. Guy* and *J. W. Harris* for appellants cited 2 Pars. Cont. (Ed. 1855) 20, Note N.; 4 Johns. Ch'y 334; 2 Perr. Tr. § 527 ; 1 Perr. Tr. §§ 321, 331, 910.

*H. H. Marshall*, *L. J. Williams* and *J. W. Davis* for appellees. *L. J. Williams* for Williams Adm'rs cited 19 W. Va. 441, 483; 26 W. Va. 460; 3 Greenl. Ev. § 326; 1 Greenl. Ev. § 553; 12 W. Va. 541; 33 W. Va. 644. *J. W. Davis* for Sneed and Stebbins cited 1 Stark. Ev. 563; 2 Stark. Ev. 937; 13 S. E. Rep. 999.

BRANNON, JUDGE:

On 19th May, 1848, John Williams and A. T. Caperton made a written agreement, from which I quote so much as is material for the purposes of this decision :

· "I have this day agreed to sell to A. T. Caperton one hundred thousand acres of my lands, as follows:  *  *  * In consideration of which sale the said Caperton is to take upon himself the payment of the debt which I owe Henry Crammond, of Philadelphia, being the remainder of the purchase-money for the large tract; and when I make the said Caperton a sufficient deed for the aforesaid lands, which is to be completed on the 1st day of September next, or sooner, if desired by said Caperton, then the said Caperton is to execute to me his obligation to pay over to me one third of the proceeds of any sale or sales which may be actually realized from sales to any person or persons other than to him, or those whom he may wish to interest in said lands with a view to a sale of them. I further agree to give my personal aid, as said Caperton may desire, in making selections and laying off such parcels of said lands as he may propose to sell, without any charge, but I am not to be at any expense in employing a surveyor or agents for that purpose.  *  *  *"

The lands lie in Webster, Nicholas, and Greenbrier counties. Indorsed on the written agreement are the following memoranda:

"We agree to take the within agreement on joint account, the deed to the lands to be made to us jointly, and the payment to Henry Crammond to be made by us in equal

amounts, as witness our hands and seals this 30th day of September, 1848.

"W. H. McFarland. [Seal.]

"A. T. Caperton.    [Seal.]"

"It has been agreed, since signing the above, that to avoid trouble in making the conveyance the deeds from Williams to be made to A. T. Caperton. W. H. McFarland, A. T. Capterton."

Pursuant to said agreement, Caperton afterwards executed the following instrument after the conveyance of the land to him as stated below :

"Whereas, a contract was entered into between John Williams and the undersigned on the 19th day of May, 1848, by which the said Williams sold to the undersigned one hundred thousand acres of land lying in Greenbrier and Nicholas, and by the terms of said contract the undersigned was to take upon himself the sale of said land, and to pay to said Williams one third of the proceeds thereof : Now, therefore, I, Allen T. Caperton, do hereby bind myself, my heirs," * * "to pay to the said John Williams, his heirs," * * "the one third of the proceeds of said lands, when realized, from any sale or sales thereof; and in the payment of said sum or sums there is to be no deduction made from the proportion of said Williams on account of any expense arising from surveys, or any other expense incident to the sale of said lands. Witness my hand and seal this 26th Feb'y, 1850.

"Allen T. Caperton, [Seal ]"

By deed dated 21st February, 1850, John Williams conveyed to A. T. Caperton the lands described in said agreement. This deed was silent as to anything to be done by Caperton by sale or payment to Crammond or Williams; it was a conveyance simply for one dollar consideration. During his lifetime Caperton sold about one fourth of said land, and accounted to Williams and McFarland therefor. Caperton died in 1876, Williams in 1863, McFarland between 1870 and 1875.

As Caperton died owning about seventy four thousand acres of said lands, besides other lands, in 1877, his administrators brought a suit in equity in the Circuit Court of

Monroe county to settle his estate and sell his lands to pay his debts; and in this suit a decree was pronounced for the sale of said land, and on the 28th February, 1882, the commissioner for sale under said decree made a contract selling to J. N. Camden the said land conveyed by Williams with some other lands of Caperton's estate ; and this sale was confirmed by decree.

Camden's contract provided for abatement from purchase-money for any land to which Caperton's title might not be good, and Camden did not at once execute his contract by payment, because of a claim made by Benjamin Rich to a large portion of the land. A suit had been brought by the representatives of Caperton against Rich, in the Circuit Court of Webster county, to remove the cloud caused by Rich's claim of title, and overthrow it; and, the suit having been transferred to the United States Court, a decree therein in 1889 sustained the Caperton title and defeated the Rich title. Also, B. P. Adams claiming a portion of the land, the representatives of Caperton instituted a suit in the Circuit Court of Webster to overthrow Adams's claim, and succeeded in doing so. Camden, upon the removal of these troubles hovering over the title, paid to the commissioners the purchase-money due from him.

The commissioners of sale appointed James S. Craig agent before the sale to Camden to pay taxes on the land, to make sales and look after the interests of those interested in it, for which Craig made claim to be paid out of the fund. The attorney employed to prosecute the said suits against Rich and Adams also made claim for services. Other expenses attended those suits.

After the contract of sale to Camden a question arose as to the disposition of the large sum of money arising from it, as to what shares the estates of Williams, Caperton and McFarland had therein ; and the commissioners then in office, who were also Caperton's administrators, brought a chancery suit in the Circuit Court of Greenbrier against the representatives of Williams and McFarland and Caperton's heirs to obtain an adjudication settling the respective rights of the parties in said fund; and, this suit having been removed from the Greenbrier to the Monroe Circuit Court,

both suits were thereafter heard together. Decrees were entered, holding that the estate of Williams was entitled, out of the sales of said land to one third of the gross proceeds of sale without deduction for taxes or costs in these two suits, or expenses incident to the Rich or Adams suit, or for compensation to Craig, or any expenses incident to sale; and Caperton's representatives appeal.

A question of great importance is, shall Williams's estate pay any portion of the large amount of taxes paid by Caperton? By the agreement, and later by the conveyance of the land by Williams, Caperton became owner of the land, and as such chargeable with taxes. No title to land was left in Williams. It may very plausibly be said, perhaps it is the true view, that the transaction was simply and only a sale by Williams to Caperton, the consideration going to Williams being the undertaking of Caperton to pay the Crammond debt, and to pay him one third of the proceeds of sale, gross proceeds, without any qualities of a trust about it—trust in the trust sense— and that the word "proceeds" is to receive a plain meaning, as importing the price at which the land should be sold. Thus it would be only a sale, Williams having a personal demand against Caperton and a lien on the land, payable out of the land when sold and not before, as he purchased it for speculation, and that one third of the proceeds was used only as a measure of the purchase-money going to Williams, not to create technically a trust; Caperton saying to Williams, "I will take the land and sell it and pay you one third of such price as I get."

But call it a "trust." What kind of a "trust," or a trust for what? Not to hold land as land for Williams's use, but a trust to sell land, and pay one third the proceeds to Williams. I do not see that this helps us. I do not see that the calling of it a trust tells us what is meant by the word "proceeds." We must still seek the intent of the parties, though we call the transaction a "trust." Though a trust, intent is to govern ; for where a trust is created by contract, by an act of a person, intent is just as important as in other acts of parties, and controls what otherwise would be the law. It is argued that it is a trust, and that being a trust

it falls under the general rule that a trust must bear the expense of its execution. But, I repeat, we must get at the intention in order that we may say whether that general rule shall prevail, or whether it is otherwise because such was not the intention in this instance.

What does the word "proceeds," as used in this instrument, mean? Caperton was, on delivery of deed, to execute an obligation to pay Williams "one third of the proceeds of any sale or sales which may be actually realized." It does not say "net proceeds," nor does it say "gross proceeds;" but does it not import gross proceeds? When we speak of "proceeds of a sale," do we not mean total proceeds, unless some language be used to narrow the sense? The words "actually realized" do not mean profit or net proceeds, but simply guard Caperton against liability for purchase-money lost by insolvency, not actually collected. The word "actually" is not in Caperton's obligation, and, if it had any bearing on this question in the first agreement, it has not in Caperton's obligation, but is substituted by the words "when realized," showing that the language in that agreement only meant that Caperton was to pay only in case of actual collection, not simply on sale.

We can say from the writing that the design was a speculative sale on Caperton's part. He designed to become absolute owner, to sell it on terms fixed by him alone, without power in Williams to participate. Caperton is not an agent of Williams. Caperton did not hold the land or any part of it in trust for Williams. As the land then was, it was simply a sale of land with a vendor's lien in Williams. Caperton wished to speculate, to make sale, but to pay the purchase-money when the sale should be made and out of its proceeds. He took the land as his absolutely, as the form of the transaction shows, and stipulated on sale to pay one third of the proceeds to Williams; and as owner to pay taxes. He used no language to guard himself against the natural meaning of the word "proceeds," though he was an able lawyer. Neither party intended that Williams should have any further ownership, or pay taxes or expenses incident to the land or its sale. Caperton took it for speculation, as his for weal or woe.

But it may be asked, suppose Caperton failed for years, or refused, to sell, where was Williams's remedy? Did not Caperton hold in trust, leaving Williams a third owner? Is Caperton to get upwards of sixty six thousand acres, though he failed or refused to sell, and hold it just for the Crammond debt, though failing to sell; the supposed ability of Capertan to effect a sale being a material element, inducing Williams to make the contract with Caperton?

To this it may be answered that both parties designed a sale, and confidently expected a sale, and trusted that to Caperton and the future; that though Williams was not to get his purchace-money until a sale should be made, yet both contemplated, not an unlimited, but a reasonable, time within which to make it, and that a court of equity would after a reasonable time enforce the vendor's lien of Williams, or cancel the agreement. Caperton and his estate kept this land for a third of a century, though he took upon him the duty and hazard of sale, and though the parties contemplated prompt sale, or within a reasonable time; and is Williams's estate, while receiving no interest, to have its share eaten up by taxes? Did the parties contemplate this? If the case is one of trust, would equity allow the fund to be eaten up thus? If the trustees kept the land, should he charge these taxes, when so keeping the land may have been to increase his return by advance in price? It does not appear that the price advanced, or that Williams received any benefit whatever from the delay.

If we consider the writing ambiguous as to this matter of taxes, then we can avail ourselves of Caperton's action under it to show the purpose or understanding of the parties. As against the view above taken, that the intrument itself imports gross proceeds, we are told that the word "proceeds" has two meanings—gross and net proceeds. Then the writing is ambiguous in a legal sense; for, if there be two things to which the language of a writing may indifferently apply, there is ambiguity. 1 Greenl. Ev. § 297; 2 Whart. Ev. 937. Where ambiguity exists, to ascertain the meaning we may look to acts done by the parties in execution of the contract, as such acts reflect, probably

truly, the intent in making it.   *Titchenell* v. *Jackson*, 26 W. Va. 460.   "Tell me," said Lord Chancellor SUGDEN, "what you have done under such a deed, and I will tell you what that deed means."   2 Whart. Ev. § 941.

How did Caperton act as to taxes under this contract? He sold some twenty five thousand acres of the lands, received money, amounting to thirty seven thousand five hundred dollars, as reported by a commissioner, of which he paid Williams more than twelve thousand five hundred dollars, charging no taxes to him, and he received of Mc-Farland half the taxes up to 1869, and made out a formal account against McFarland's estate for half the subsequent taxes.   It is strange that Caperton should pay Williams so much money, charging no taxes.   Strange that he should collect of McFarland half the taxes, if Williams had to pay one third of them.   McFarland was associated with Caperton under the agreement between Caperton and Williams; that is, he joined Caperton in the purchase and became owner of half the land, and the deed from Williams was to be made to Caperton and McFarland, thus making them joint purchasers, as shown by the memorandum between them quoted above; and it was all right and consistent with their relations, to charge half of the taxes to McFarland.   I think this action of Caperton, charging Mc-Farland half the taxes, admissible as an act of Caperton connected with the execution of the contract with Williams.

It is said that Caperton reserved the matter of taxes for future adjustment; that while in the first instance, as between him and McFarland, they were to share the tax burden equally, yet in the end he contemplated charging a third to Williams.   This is highly improbable, and not proven.   That from 1848 to his death, in 1876—twenty eight years—Caperton should pay more than twelve thousand five hundred dollars at different times, and, as the commissioner states, take divers receipts, specifying payments to Williams as thirds of particular payments on lands by the different vendees, and keep no account of charges against Williams for taxes, is not consistent with the idea that he construed the contract as requiring Williams to pay.

taxes. Had the receipts been small, the argument would not be so strong as it is when we see that Caperton paid Williams more than the large sum of twelve thousand five hundred dollars and had paid large taxes. I do not bring into consideration a deposition given by Caperton in another suit, in 1876, or a letter written to a representative of McFarland, because I do not regard these subsequent declarations admissible for or against Caperton as evidence bearing on the construction of said writings. *Titchenell* v. *Jackson*, 26 W. Va. 460; *Crislip* v. *Cain*, 19 W. Va. 441, p't 13 syl. I will add that, if considered, they would not aid the Caperton side of the case. I do not think taxes are chargeable to Williams's share of the money.

Next as to cost in litigation to clear title, and, in these suits, Craig's compensation, *etc.* Here we must still remember that the land became Caperton's, and he was to sell it and was paid for so doing and for all expenses incident by the conveyance of the land. His obligation of 26th February, 1850, admits that he took upon himself the burden of sale, and agreed to pay Williams one third of the proceeds, and that "there is to be no deduction made from the proportion of said Williams on account of any expense arising from surveys, or any other expense incident to the sale of said lands." This is decided and broad. It does not appear when the title claimed by Rich arose, or that Caperton was not responsible for it, or what its character. The Rich suit resulted in sustaining the title Williams conveyed, and thus there was no liability on Williams for breach of warranty. *Smith* v. *Parsons*, 33 W. Va. 644 (11 S. E. Rep. 68).

I know that it is not on the idea that there is a warranty that the duty of Williams to contribute to the vindication of title is predicated, but on the idea of a trust. Still, though it be a trust, the obligation of Caperton carefully protects Williams against all expense incident to a sale, and if these suits were necessary to clear the title to consummate a sale the expenses of them may be treated as expenses incident to a sale; and, besides, it was Caperton's land, and his representatives were only vindicating his own title, and it does not appear that Caperton's fault alone may not have rendered the suits necessary.

As to costs of suit of Caperton's administrators against his heirs, the suit was brought to settle his estate and sell his land. Why should Williams pay any of these costs? It was not to sell Williams' land. If, after Caperton's death, this suit was the only proper and effectual mode of selling the land in question, why shall we not call these costs expenses incident to the sale, and exonerate Williams from them, under the letter of Caperton's obligation?

There seems at first thought more plausibility for charging Williams with a portion of the costs in the suit of *Stiles and others* v. *Williams's Adm'r and others,* on the theory that it is a suit to settle rights in a fund; but in fact it is a suit by Caperton's representatives against Williams's representatives to compel Williams's estate to pay taxes and other outlays relating to the land, on the theory that Williams must pay one third thereof, and, as Williams's estate prevails in the contention, there is no solid ground for its paying any of the costs of this suit. And in any view the amount which would be chargeable for this cause would be small.

There is no reason for charging any part of the compensation of three thousand seven hundred and fifty dollars to Craig to Williams's estate. He was employed by whom? By the commissioners appointed to sell land of Caperton in suit brought by his representatives to close his estate. He was employed to sell the land. Is not that an expense incident to the sale? And, so far as his service was not in selling land, he was attending to Caperton's land. Did either Caperton or Williams for a moment contemplate that expenses of caring for and attending to, and labor of paying taxes should be chargeable to Williams? I do not think that even the commission allowed to commissioners for selling land under the decree should be charged to Williams. Why not? Because it was for the sale of Caperton's land, not Williams's, in a suit brought to administer Caperton's estate; expenses incurred in selling the land, as much so as any expenditure which Caperton may have incurred by selling through an agent in his lifetime. If it became necessary, on Caperton's death, to sell under a suit by commissioners, that is an accidental circumstance—

Caperton's misfortune, not Williams's fault. Just as Caperton held the land in his lifetime, so his heirs held it after his death. His heirs had to sell it, and save Williams from expense incident to the sale, because the obligation of Caperton's covenant fell upon them as it had rested on him. Williams's estate simply has a debt allowed against Caperton's estate, and why charge commission to it more than other creditors?

AFFIRMED.