# CHARLESTON.

BELCHER v. BIG FOUR COAL & COKE CO. *et al.*

Submitted March 18, 1910. Decided February 21, 1911.

1.  ACCOUNT—*Equity—Jurisdiction—Accounting.*
    Equity has jurisdiction of a suit for an accounting, when there is a privity of contract between the parties, even though the accounts be all on one side, when the bill prays for a discovery and alleges facts which show that a discovery is essential to the establishment of plaintiff's rights.

2.  EVIDENCE—*Parol Evidence—Latent Ambiguities in Written Instrument.*
    Parol evidence is always admissible to explain latent ambiguities in a written instrument.

3. SAME.

 When the owner of coal makes a written lease of it, in consideration of a royalty of $1.50 per "railroad car, or its equal, of coal," and it appears that, at the time the lease was executed, railroad cars of various sizes were used for transporting coal, there is a latent ambiguity in relation to the unit of measurement; and parol evidence is admissible to explain what was the capacity of the car intended.

4. CONTRACTS—*Construction—Acquiescence.*

 When it appears that the lessor in such a lease has performed no other act than to receive the money under it, at the rate of $1.50 per railroad car, for whch he was not required to execute a written receipt, he will not, for simply receiving the money, be held to have acquiesced in the construction sought to be placed upon the lease by the lessee. He is not estopped thereby from proving that he had a different understanding of the terms of the lease from that claimed by the lessee.

 (BRANNON, JUDGE, absent.)

Appeal from Circuit Court, McDowell County.

Bill by Andrew Belcher against the Big Four Coal & Coke Company and others. Decree for plaintiff and defendants appeal.

*Modified and Affirmed.*

*Ritz & Ritz,* and *Anderson, Strother & Hughes,* for appellants.

*Cook & Howard,* for appellee.

WILLIAMS, PRESIDENT:

Andrew Belcher brought his suit in equity in the circuit court of McDowell county against the Big Four Coal & Coke Company, a corporation, John Stanilaus Brophy and James Francis Brophy, and the Cirrus Coal & Coke Company, a corporation, defendants, to recover an alleged balance of royalty due him, on coal mined pursuant to a coal lease executed by said Belcher and his wife to the company first above named, on the 15th day of August, 1899. The bill also prays for a discovery by the defendants of the respective amounts of coal mined by them during their several operations of the mine. The defendants demurred to, and answered, the bill. Plaintiff joined in the demurrers, and replied generally to the answers. The cause was finally heard on the 7th day of August, 1909, upon the

pleadings, exhibits filed therewith, and the depositions of witnesses; and the court overruled the demurrer and pronounced a final decree in favor of the plaintiff as follows, viz.: Against the Big Four Coal & Coke Company for $2,108.95; against the Brophys for $263.64; and against the Cirrus Coal & Coke Company for $4,838.50; with interest on each of said sums from the date of the decree until paid.

The lease, instead of providing a certain royalty per ton for coal mined, which is usual in coal leases, provides for the payment of, "the sum of one dollar and fifty cents for each and every railroad car, or its equal, of coal, dug, mined, hauled from or through the aforesaid premises, and used on the premises or shipped away from the tipple or works of the said lessee." The suit grows out of the different constructions which the parties seek to give to the words, "railroad car, or its equal," used in the lease. This is the only unit of measurement mentioned in the lease.

The Big Four Coal & Coke Company operated the mine until September 24, 1904, when it transferred its lease to the Brophys who operated it until December 31, 1904, and they then assigned it to their co-defendant, the Cirrus Coal & Coke Company.

The mine is located on the Norfolk and Western Railroad in McDowell county and at the time of the execution of this lease the railroad company was using cars for the shipment of coal of 30,000, 40,000, 50,000, and 60,000 pounds capacity. And afterwards began to use larger engines and cars, some of which cars had a capacity of 100,000 pounds, and very much of the coal from this mine was shipped in the larger cars.

The record presents the following questions: (1) Has equity jurisdiction? and (2) What is the proper interpretation of the words, "railroad car, or its equal" used in the contract?

Plaintiff alleges that what was intended by the words, *railroad car,* was a car of 40,000 pounds capacity. He also alleges that he does not know how many cars of that capacity, or their equivalent, have been mined, nor does he know how many tons of coal have been mined, and he prays for a discovery from each of the defendants of the number of tons of coal mined by them during their respective operations.

It is insisted that plaintiff has a complete and adequate rem-

edy at law, and that, therefore, it was error to overrule the demurrer.  It seems, however, to be well settled that, in matters of account growing out of privity of contract between parties, not only where the accounts are mutual and intricate, but also where the accounts are all on one side, and a discovery is sought, which is material to plaintiff's relief, equity has jurisdiction. *Lafever* v. *Billmyer,* 5 W. Va. 33; *Thompson* v. *Whittaker Iron Co.,* 41 W. Va. 574; *Dudley* v. *Niswander,* 65 W. Va. 461; *Swearengen* v. *Steers,* 49 W. Va. 312; 1 Story's Eq. Juris., sec. 459; 4 Pomeroy's Eq. Juris., sec. 1421; Hogg's Eq. Prin., sec. 16.  The bill alleges that the plaintiff has not the information which he seeks to discover; that the facts which he desires are in the possession of defendants; and that they are essential to the proving of his case.  According to the authorities above cited the bill clearly makes a case for equity jurisdiction.

Did the parties have in mind a car of any particular capacity when they agreed upon a royalty of $1.50 per "railroad car, or its equal;" or, did they intend that only so much royalty was to be paid per railroad car, regardless of the quantity of coal that might be shipped in a car?  We think they evidently meant that a car of some definite size or capacity was to be taken as unit of measurement.  This intention is manifest from the use of the words, "or its equal," which immediately follow the words, "railroad car."  They evidently knew that the coal would be shipped in railroad cars; what then could they have meant by the words, "or its equal?"  They clearly relate to a definite quantity, to a certain unit of measurement, not to a variable one. Both the lessor and J. W. Booth, the agent of the lessee who procured the lease contract, knew that, at the date of the lease, cars of various capacities were used by the Norfolk & Western Railroad Company for transporting coal from the vicinity of this mine.  The railroad company was then using cars of 30,000, 40,000, 50,000, and 60,000 pounds capacity.  Which size did they contemplate as the unit of measurement?  In view of the fact that both contracting parties knew at the date of making the contract that cars differing in size were to be used, taken in connection with the words, "or its equal," which were intended to qualify the words, "railroad car," immediately preceding them, the contract is ambiguous in respect to the unit of measurement which they intended.  They meant a car of some cer-

tain size, or capacity, but the size, or capacity, of which they failed to mention in the written contract. There is, therefore, a latent ambiguity in the contract, disclosed by the facts proven in the case, which renders its construction necessary; and it must be construed in the light of all the facts and circumstances surrounding the parties at the date of the execution of the contract, and known by them to exist. Consequently, for the purpose of arriving at the correct intention of the parties, parol evidence is admissible; not, however, for the purpose of adding to, contradicting or varying the plain terms of a written instrument, but for the purpose of explaining that which is ambiguous, and thus arriving at the true intention of the contracting parties. In the present case, wherein a latent ambiguity appears, even the parol declarations of the parties to the contract, made at the time of, and prior to the execution, are admissible to prove what size of railraod car was intended. *Johnson* v. *Burns,* 39 W. Va., 658; 4 Wigmore Evi.; section 2472; 17 Cyc. 741; *Brent* v. *Richards,* 2 Grat. 539; *Tuley* v. *Barton,* 79 Va. 387; *Maynard* v. *Render,* (Ga.) 23 S. E. 194.

"The term barrel as used in a contract for the sale of one thousand barrels of petroleum oil may mean either a quantity or vessel, and parol evidence is admissible to show in what sense the parties used it." *Miller* v. *Stevens,* (Mass.) 97 Am. Dec. 123.

"In an action on a contract for the purchase of six hundred casks of a certain kind of black lead, oral evidence of the size of the casks agreed on is admissible." *Keller* v. *Webb,* 125 Mass. 88, 28 Am. Rep. 209.

"Where machinery sold is guaranteed in writing to take care of all the pulp produced by four Scott grinders, and it is shown that Scott grinders are of varying capacity, it may be shown by parol evidence that the guaranty was given on the representation of the purchaser that he had contracted for the purchase of four Scott grinders of a stated capacity." *Bagley & Sewell Co.* v. *Saranac, &c. Co.,* 135 N. Y. 626 (32 N. E. 132.)

It is abundantly proven that before the lease was executed, Booth offered to give Belcher ten cents per ton, or $1.50 per railroad car as a royalty, and that Belcher chose to accept the latter, because, as he says, he lived near the mine, and could see the cars as they were moved away from the mine, and could keep account

of them, and that he could not be able to keep account of the tonnage, and, moreover, because Booth told him that $1.50 per railroad car would be about the same as seven and a half, or eight cents, per ton.  Belcher says that Booth also told him that the coal company wouldn't be allowed any but the small cars for the shipping of the coal; that there "wouldn't be a sixty more than once a month; more than one or two and may be *nary* one." He further says: "He offered me $1.50 a car or ten cents a ton but I thought it was about the same.  By his making that proposal I thought it was about the same.  I wanted to take it by the car because I thought they would ship it away and I wouldn't know what they were paying me for it, and they might pay me whatever they wanted to pay." Plaintiff is corroborated by a number of witnesses.  Floyd Belcher, his son, says he heard Booth tell his father and mother that he had figured on the royalty at $1.50 a car and that it would amount to seven and a half or eight cents per ton for the coal.  Mrs. Belcher, wife of the plaintiff, says that Booth had an option to lease the coal, which was about to expire; that he came to see Mr. Belcher about extending, or renewing it; and that she objected to renewing it unless they were allowed more royalty per car.  She says: "I told him (Booth) that I had been paying attention to the cars and I *seed* there was some right smart larger than others and he says 'Oh Mrs. Belcher we can't; we won't be allowed these big cars; us nor John Mitchell neither.' John Mitchell had a little mine here.  He says we might get one or two once a month and *maby nary* one." Mr. G. L. Stone, who was called in to witness the renewal of the option, testifies to the same conversation.  Samuel Day, another witness, says he heard Mr. Booth tell Mr. Belcher that he would give him ten cents a ton, or $1.50 per car, for his coal.  J. H. Belcher, another son of the plaintiff, says that just before the lease contract was executed Mr. Booth had it prepared, and requested witness to go with him down to his father's and explain the contract to him; that Booth told his father, "that he was to receive under that lease contract $1.50 a car; at least seven and a half cents royalty, basing his figures on a forty ton car, claimed that that would be about the average car that he would receive royalty on." Witness then corrected his statement as to a "forty ton car," and said that he (witness) meant a forty thousand pound car.

Booth denies making any of the statements testified to by the witness above named. But his own testimony amounts, nevertheless, to a practical admission of their truth. On cross-examination, Booth was asked this question: "Q. Knowing that there were different sized cars used by the railroad company at that time for coal carrying purposes, what did you estimate that the coal would cost you per ton at $1.50 per car?

"A. Well, at that time I had calculated on sub-leasing it, and tried to lease the coal at ten cents per ton. I thought I could make two cents a ton profit on it myself, that's the whole upshot of it."

The difference between a royalty of $1.50 per 40,000 pound car, and ten cents a ton, is two and a half cents per ton. Therefore, this statement by Booth shows that he must have had in mind a car of about that capacity, at the time he got the lease. It thus appears that the minds of the contracting parties had then met on the unit of measurement. C. W. Elliott, another witness for plaintiff, who at the time of the execution of the lease was in the service of Booth, says that he heard Booth talking about the lease, and heard him say that he had made a deal with Belcher for $1.50 a car; that he and the witness were figuring on it to see how much difference there was between $1.50 a car and ten cents per ton royalty. He says: "The difference was the way we figured it, it would cost seven to eight and a half cents, and he said if he could get in some large cars it would make it a little better."

The whole of the testimony, read in the light of all the surrounding circumstances, clearly proves that both the lessor and the lessee meant, by the use of the words "railroad car, or its equal," a car of 40,000 pounds capacity. Such a car at $1.50 is equivalent to a royalty of seven and a half cents per ton.

Since October, 1903, much of the coal has been shipped in cars of 80,000 and 100,000 pounds capacity, and since April, 1905, nearly all of it is shown to have been shipped in the 100,000 pounds cars. There is no reason whatever to suppose that the parties contracted with reference to these larger cars, for they were not then in use by the Norfolk & Western Railroad Company, over whose line the coal had to be shipped. The construction of the contract contended for by appellants is unreasonable, and if such were in fact the construction which the

lessee placed upon the contract at the date of its execution, it would prove that he drove a hard bargain, an unconscionable contract with the lessor, and one of which a court of equity would relieve him upon proper application. A royalty of $1.50 per 100,000 pounds of coal is the equivalent of three cents a ton. The customary royalty was ten cents a ton at the date of the contract.

In addition to the testimony which proves that the parties contracted with reference to a railroad car of 40,000 pounds capacity, there is still another reason deducible from the facts which shows that they must have had reference to a car of that size, and that is, that a car of that size appears to be an average of the cars then in use by the railroad company. When the lease was made the railroad company was using 30,000, 40,000, 50,000 and 60,000 pound cars; and the proof is that the sixties were very rarely used in hauling coal from the small mines. A forty car would, therefore, appear to be an average car. We can come to no other conclusion, from the proof, than that the words, "railroad car, or its equal," used in the contract, mean a railroad car of the capacity of 40,000 pounds.

It is insisted that by his continuing to accept $1.50 per car in weekly, or bi-weekly, payments for so many years after the lease, and by his long delay in bringing his suit, Belcher has thereby acquiesced in the construction which appellants seek to have placed upon the contract; that such conduct proves a practical construction which has become binding on him; and *Crislip* v. *Cain,* 19 W. Va. 438; *Titchenell* v. *Jackson,* 26 W. Va. 460; *Heatherly* v. *Bank,* 31 W. Va. 70; and *Caperton* v. *Caperton,* 36 W. Va. 479, are cited in support of this contention. All that plaintiff did was to receive the money when it was sent to him. He was not even required to receipt for it. He has performed no act under the contract; he was not required to do anything; as to him it was an executed contract; no further duty rested upon him to give efficacy and completeness to the lease. He had fully performed his obligation when he executed the lease; all the things to be done thereafter had to be performed by the lessee. Does his receiving the money, when it was sent to him, prove his acquiescence? We think not necessarily. He was generally paid by checks drawn by the president of the coal company, and mailed to its agent who was in charge of

the mine, and by him turned over to plaintiff. Moreover, it is clearly proven that plaintiff was not satisfied to accept $1.50 per car load for any, and all, sizes of cars. Plaintiff says he went to Mr. Coffman, who was the president of the Big Four Coal & Coke Company, and objected to their using the large cars. Mr. Coffman does not deny this, but says, "I have no recollection of being interviewed by Andy Belcher himself, on the size of the cars." Mrs. Belcher testifies that on one occasion she went with her husband to the mine and heard him make complaint to both Mr. Booth and Mr. Coffman concerning the size of the cars. She says she told Mr. Booth: "I thought we wasn't to get these big cars," and that Mr. Coffman then replied "Oh Mrs. Belcher you just go in here and see what sort of a place we have to get this coal out and you wouldn't kick;" and that she replied that wasn't any of her business. She also says that she talked to Mr. Brophy, one of the assignees of the lease from the Big Four Coal & Coke Company, and made complaint to him in regard to the big cars. These conversations are not denied. Plaintiff was an illiterate man, unable to write or read writing. His son, J. H. Belcher, testifies, that, in the early part of 1902, he had some correspondence with Mr. Coffman, at the request of his father, that he wrote Mr. Coffman that his father would expect him to pay royalty over and above the 40,000 pound cars on all the large cars, and that Mr. Coffman replied: "that he did not know that he didn't know that he had the whole Belcher family to deal with; that he thought he was transacting business with Andrew Belcher." Neither the original letters nor copies of them appear in the record; but the witness testified that he had searched for the letters, and that he was unable to find them; and the testimony of this witness is not denied by Mr. Coffman. No doubt plaintiff may have been ignorant of his rights under the contract, and possibly he may have thought that he was bound by its terms to accept $1.50 per railroad car for his coal, regardless of whether the car contained 40,000 pounds, or 100,000 pounds; but the evidence certainly proves that, at the date of the execution of the contract, he did not think he had thus bound himself; and it furthermore proves that he was not, at any time after the execution of the contract, willing to acquiesce in that interpretation of it. He has done no act which would lead the defendants to believe that such was his under-

68 W. Va.

standing of the agreement; and his delay to assert his rights has occasioned no injury to any of the defendants. They have no right to complain because all the money which Belcher was entitled to receive, under the contract, was not paid to him when due. His delay has not injured any of the defendants, or been prejudicial to their rights. This case does not come within the principle laid down in *Crislip* v. *Cain,* 19 W. Va. 438, and the other cases cited by counsel for appellants.

The lower court found the unit of measurement to be a car of 50,000 pounds. We fail to see how the court could have arrived at this conclusion in view of the evidence herein recited. The court has erred to the prejudice of appellee, and there is cross-assignment of it in brief of his counsel. Consequently, we will reverse so much of the decree as interprets the words of the contract, "railroad car, or its equal, of coal" to mean a car of coal of the weight of 50,000 pounds, and also so much of the decree as decrees in favor of plaintiff against the several defendants certain sums of money as balance of royalties due from them, respectively, to him; and instead thereof we will enter a decree in this Court interpreting the words in the lease "railroad car, or its equal, of coal," to mean a railroad car of 40,000 pounds capacity; and instead of the several sums of money found to be due the plaintiff by the court below, we find that there is due to the plaintiff from the several defendants the following sums, as of the 7th day of August, 1909, viz.: From the Big Four Coal & Coke Company, four thousand three hundred and fifty-nine ($4,359.20) dollars and twenty cents; from John Stanilaus Brophy and James Francis Brophy, four hundred and sixty-one ($461.43) dollars and forty-three cents; and from the Cirrus Coal & Coke Company, seven thousand four hundred and forty ($7,440.57) dollars and fifty-seven cents; and we will enter a decree in favor of plaintiff against said defendants severally for said sums of money, with interest on each of said sums from the 7th day of August, 1909, until paid. In all other respects the decree will be affirmed.

*Affirmed.*