## CHARLESTON.

### W. F. HENDERSON v. R. H. KESSEL, et als.

Submitted January 23, 1923.     Decided February 6, 1923.

1.   GUARANTY—*Suit May be Maintained Upon Absolute Guaranty Without Exhausting Remedy Against Principal Debtor or Showing Him Insolvent.*

   A guaranty in form "We, the undersigned, do hereby guarantee the payment of $4,802.50 to W. F. Henderson upon the completition of well now drilling on the Barber farm", duly signed by the guarantors, is an absolute guaranty of payment when the well is completed; the guarantee therein, in order to maintain suit thereon against the guarantors, may do so without having exhausted his remedy against the principal debtor or showing the principal debtor is insolvent. p. 71).

2.   EVIDENCE—GUARANTY—*Circumstances and Parol Declarations of Parties at Time Guaranty Executed Admissible to Show True Consideration.*

   In an action on the guaranty, the guarantors have the right to show that the guarantee therein named was, when the guaranty was signed, engaged in drilling the well for the principal debtor under a written contract; to show the terms of the contract and the amount owing thereon; and to show the consideration for the guaranty.   In such case parol declarations of the parties at the time the guaranty was executed are admissible to show the true consideration. (p. 68).

3.   MINES AND MINERALS—*Contract for Drilling Oil and Gas Well Construed as Completion Thereof.*

   Under a written contract the owner, a corporation, agrees to furnish the rig, fuel and casing, and the contractor to furnish the tools and labor to drill an oil well for the owner. The contractor agrees that unless oil or gas be found in paying quantities at a lesser depth he will drill the well through the Berea Grit sand and clean it out; no oil or gas being found at a lesser depth, his drilling the well through the Berea Grit sand and cleaning it out is a "completion of the well" under the terms of the contract.   (p. 67).

4.   GUARANTY—*Individuals Assuming Guaranty Entitled to Show Original Contract.*

   Under the terms of such written contract, when the well was drilled to the top of the Berea Grit sand, the corpora-

93 W. Va.

tion was to deposit in a designated bank, to the credit of contractor, the unpaid balance of the drilling price, which was to be paid him when the well was completed. The corporation was unable to make the deposit; thereupon certain interested individuals, in order to have the well completed, executed a writing guaranteeing to the contractor the payment of a stipulated sum of money upon completion of the well then drilling, estimated by the contractor to be sufficient to cover the balance of the contract price; the well was drilled through the Berea Grit sand; no oil or gas being found in that sand, the contractor, at the request of the corporation, performed extra work by drilling the well deeper, bailing the well, pulling the casing, and finally plugging the hole. In an action on the guaranty, the guarantors are entitled to show by the circumstances, the terms of the original drilling contract and the declarations of the parties at the time of the execution of the guaranty, that the term "completion of well now drilling" in the written guaranty meant the completion of the well in the Berea Grit sand and not its completion on a final termination of the extra work. (p. 70).

5. PAYMENT—Debtor Owing Two Debts May Designate Payment on Either of them.

A debtor, owing a creditor two debts, when making payment, has the right to apply the payment on either of them as he may elect, and if he makes such application, the creditor is bound to credit the payment to the debt to which the debtor has applied it. (p. 71).

6. SAME—Applied to Item First Due and Thereto Remaining Items in Order.

Generally, when application of payment is made by the debtor to an account, consisting of different items of indebtedness, maturing at different times, the payment will be applied to the item first due and then to the remaining items in order of their due date. (p. 71).

7. TRIAL—Giving Oral Instructions in Civil Case, Error.

Section 22, chapter 131, Barnes' Code, 1923; section 1 chapter 72, Acts 1915, requiring instructions to be in writing is mandatory; and it is error for the court to give an oral instruction to the jury, governing the matters in issue in a civil case, even thought the instruction be correct as a matter of law. p. 74).

8. SAME—*Error of Oral Instruction in Civil Case Not Cured by Reporter's Transcript Thereof.*

Such error is not cured by a reporter taking down the instruction in short-hand and thereafter transcribing it into long-hand. Counsel for the parties are entitled to an opportunity to inspect the instruction before it it given to the jury, in order to determine whether objection will be made thereto, and this can not be done until it is reduced to writing. (p. 74).

(McGINNIS, JUDGE, absent).

Error to Circuit Court, Jackson County.

Action by W. F. Henderson against R. H. Kessel and others. From a judgment for plaintiff, defendants bring error.

*Reversed and remanded.*

*T. J. Sayre* and *Hogg & Hogg,* for plaintiffs in error.
*J. L. Wolfe,* for defendant in error.

MEREDITH, JUDGE:

Plaintiff obtained a judgment against R. H. Kessel, A. W. Sayre, and A. G. Stover, for $1550, in an action of assumpsit, upon a contract of guaranty. Defendants assign various errors, which require a statement of the matters involved.

Plaintiff is a contractor engaged in drilling oil and gas wells. He had done some work of that kind near Clendenin, for the Paramount Oil & Gas Company, a West Virginia corporation. That company had considerable acreage under lease for oil and gas near Cottageville, in Jackson County, this state. Plaintiff's drilling tools and machinery were at Clendennin. The company and he entered into a written contract, dated November 22, 1920, by which it was agreed substantially as follows:

(1). Henderson was to remove his tools and machinery to the company's property near Cottageville, at his own cost, except the company was to pay railroad freights to that point; (2) he was to drill two wells on its property, at points selected by it; (3) for which the company was to pay him

$3.75 per lineal foot of depth for each well drilled; (4) $1500 as an advance when the drilling tools were strung and the drilling commenced, (5) the further sum of $1000 on account when the salt sand was reached, (which was supposed to be at a depth of about 1200 feet) and the 8 inch casing put in place, and (6) the further sum of $1000 on account when the Big Lime was reached (which was agreed to be about 400 feet below the salt sand) and the 6 inch casing put in place; (7) that both of the wells should be drilled through the "Berea Grit" sand, unless oil or gas in paying quantities should be found at a lesser depth and the company alone should determine whether oil or gas was found in paying quantities before reaching the "Berea Grit" sand; but unless it directed him to cease drilling, he was to drill the wells through the "Berea Grit" sand; (8) the diameter of each well was to be not less than 5 inches at bottom, when completed; (9) when a well was completed, the company was to pay him a sum sufficient to aggregate $3.75 per lineal foot drilled, after deducting all payments made by it to him, on account of the drilling operations, and it was to place to his credit in the Kanawha National Bank of Charleston the portion remaining unpaid when each of said wells was drilled to the top of the "Berea Grit" sand, but said sum was not to be paid him "until the well is completed as herein specified" (10) he was to prosecute the drilling diligently and in a workmanlike manner and without delay, except such as might arise from unavoidable causes, until the drilling operations were completed and to place all casing in the wells in an approved manner; (11) when he had put the casing in place in a proper manner, he should not thereafter be liable if the casing collapsed through no fault of his, nor should he be responsible for damage caused by defective casing; (12) the company was to furnish all casing, derricks, and fuel for drilling the wells; he was to furnish all drilling tools and water in drilling operations, the tools to be and remain his property; (13) when drilled to the depth required, each well was to be thoroughly bailed and sand-pumped by him until all drilling and sediment should be removed from

the well and the well thoroughly cleansed; (14) if oil or gas should be found in paying quantities at any depth, he, if requested by the company, was to leave and allow his tools to remain in or at the wells, the company to pay a reasonable price per day for their use for such purposes; the company was to pay at the rate of $75.00 per day of 24 hours each as delay rental for the tools if the company should be responsible for any delay after the beginning of the drilling on each of said wells; (15) the expense of equipping each well in case oil or gas should be found in paying quantities, should be borne by the company; (16) he, his agents and employees, were to keep all information about the wells secret from all persons, except the company, or its authorized agents; (17) he was to keep a "log" of each well and furnish it to the company or its agents, who should at all times have a right to inspect the wells while they were being drilled; all measurements were to be made with standard steel tape to be furnished by him; (18) each well, when completed, should at once be delivered to the company, or its duly authorized agents, in proper completed condition, clear of obstructions and free from all claims and liens for work done and material furnished; (19) if there should be any unnecessary delay in the work on account of fishing for tools or supplies that might be lost in the wells, or otherwise, the company might require him to remove the derricks and begin a new hole, the company to pay only for drilling two wells; and when so required, by it, he agreed to begin drilling a new hole, it being agreed that two wells should be drilled to completion, as provided, notwithstanding a hole or a number of holes might have been commenced; (20) if the company should direct any casing in the wells, or either of them, to be pulled and reamed, it was to pay him the cost therefor; the cost of reaming was to be paid at the rate of $3.75 per foot; (21) he, and not the company was to be responsible for any injury to any person who might be injured about the wells, during the drilling operations, his responsibility to cease when the wells were turned over to the company.

Such, in abbreviated form, omitting repetitions and unnec-

essary verbiage, was the contract. The numbers in parenthe-
ses represent the numbers of the several paragraphs of the
contract. Plaintiff drilled but one well, beginning operations
about January 8, 1921. The work progressed, somewhat
slowly, until about 9 o'clock on the night of April 1st, when
he had reached the top of the ''Berea Grit'' sand, at a depth
of 2090 feet; at that depth a smell of oil or gas was dis-
covered. Defendant Stover, who appears to have had consid-
erable experience in the oil business was there. He was an
officer in the company, but what office he held does not ap-
pear. Defendant Dr. R. H. Kessel, the president, was ab-
sent. Henderson asked Stover what he should do, go ahead
drilling or stop; Stover told him ''to go ahead and knock
the bottom out of it.'' Henderson hesitated, finally quit,
went to his boarding house, and phoned Kessel to come. Kes-
sel came to the well about noon the next day, where he met
Henderson, Sayre and Stover. Prior to this time, the com-
pany had made its three payments aggregating $3500, but
whether it had met them according to the contract does not
appear. It had not placed to Henderson's credit in bank the
balance of the money as the contract provided, though Kes-
sel had been making an effort to do so. When they met at
the well, Henderson said he did not care to go ahead on
account of the money, that he was afraid the company did
not have enough money ahead to pay him, Stover sug-
gested that the three, he, Kessel and Sayre, guarantee the
money and Henderson agreed to accept their guaranty and
go ahead. They asked him how much it would be. He said
he did not know, but figured a short time and reported $4,-
802.50. Henderson then prepared and they executed and de-
livered to him the following guaranty:

"April 2, 1921.

We, the undersigned, do hereby guarantee the pay-
ment of $4802.50 to W. F. Henderson upon the com-
pletion of well now drilling on the Barber farm.
R. H. KESSEL,
A. W. SAYRE,
A. G. STOVER."

The well was being drilled for the company under the contract upon the Barber farm near Cottageville. As already stated, the hole at that time had been drilled to the top of the "Berea Grit" sand, a depth of 2090 feet. Under the seventh paragraph of the contract, Henderson was to drill the well through that sand, unless oil or gas should be found in paying quantities at a lesser depth. Oil or gas was not found in paying quantities at a lesser depth, so his contract required him to drill through that sand. He testifies that "On April 5th, we drilled the well in and fixed it for shooting; that is the day we stopped drilling, and we got ready to shoot the well." The Berea Grit sand at that point was only 6 or 8 feet thick, he says, and that he could, after drilling through it, have cleaned the sand and sediment from the bottom, so as to have complied with his contract, in about two hours, at most, in less than half a day. He further testifies that on April 6th the well was shot, and on the 7th, 8th and 9th he cleaned it out. It was then shut down and allowed to stand until the 25th. Meanwhile Stover with one Hayes came over from Charleston to test the well. Henderson began again on the 25th and continued till the 30th, six days, bailing and cleaning the well out. On the 29th or 30th notice was given him by the company to plug the well, and it furnished him with the necessary plugs for that purpose. Thereafter, he pulled the casing and plugged the well, finishing the work on May 7th, as shown by his account furnished the company. In another part of his testimony, Henderson says that after April 2, he drilled 139 feet, making a total depth of 2229 feet. On being asked: "Tell the jury how you came to drill the extra feet after you struck the Berea Grit," he answered, over defendant's objection: "I was requested by Dr. Kessel, thinking we wasn't deep enough for the Berea Grit." Just when he did this extra drilling is not clear from his testimony, as the record or log of the well was not introduced, and Henderson's testimony is very fragmentary.

Defendants claim that under their guaranty the term "Upon the completion of well" means, "upon the completion

of the well under his contract with the company.'' They do not put it exactly that way,. but substantially so; on the other hand, Henderson interprets the expression to cover not only drilling the well through the Berea Grit sand and cleaning it out there, but all the extra work of drilling the additional depth of approximately 130 feet, bailing after shooting, pulling the casing and plugging the hole. In other words, he claims the guaranty covers the extra work done; they claim it does not.

We think it clear that under the contract with the company, Henderson completed the well when he had drilled it through the Berea Grit sand. This is inferentially conceded by his counsel. Under the contract he was not required to drill deeper. When he had drilled through that sand and cleaned the well out, the balance of his money was due. When he had reached the top of that sand, the company was to place the balance to his credit in bank; this was to make him secure. He knew it would be easier to secure the money then, than afterward, and so his contract so provided. But it was not to be paid him until he had drilled through the Berea Grit and he had cleaned the well out. The contract in no wise provided for any drilling beyond the Berea Grit. Any work beyond drilling through that sand and bailing and sand-pumping the well so as to clean it out was extra work. The well then was to be turned over to the owner. If it should produce oil or gas or both, the expense of equipping the well was to be borne by the owner. Nothing is said in the contract about a dry hole in the Berea Grit. That was not contemplated. It seldom is. What was to be done in that case? The contract does not say, but clearly the obligation of Henderson was at an end. He could not be compelled to do more. If oil or gas should be found there, he was, if requested by the company, to leave his tools there for the company's use at a fair rental, but the contract does not require him to do this if the well proved dry in that sand. So it is clear that when he had drilled through the Berea Grit and cleaned out the well, the well was completed under his

contract with the company. Was it then completed under the terms of the guaranty? Defendants claim that it was; he claims it was not completed until all the extra work was done. The question arises in this way:

The well was drilled through the Berea Grit April 5th, at a depth of about 2100 feet, though the exact depth is not disclosed. On April 13th, the company paid Henderson by check $2500. This was accompanied by a voucher which read on its face: "To check on account of drilling well at Cottage-ville, $2500" and which he receipted "In settlement of account as stated above." Defendants claim that all of this check should have been credited on the account guaranteed by them, to-wit, the $4802.50; Henderson applied only part of it on the guaranty. Thereafter, the company made payments as follows:

> May 2, To check on account.........$ 500.00
> May 16, To check on account........$ 500.00
> July 19, On account................$1600.00

The last three items, amounting to $2600 were credited by Henderson on the guaranty. These four payments aggregate $5100, hence defendants disclaim liability for any balance due. Henderson applied part of the $2500 on the extra work, part on other items not strictly coming within the terms of the drilling contract, $449.50 on the "old account" as he calls it, and what was left, $588.75, and the payments aggregate $2600 were applied by him on the guaranty, thus leaving the defendants owing, according to his figures, $1,-613.75.

The defendants offered evidence to show that at the time the guaranty was signed, Henderson stated that when the company should pay him $4802.50, the guaranty would be paid and the guarantors relieved. This evidence was excluded on the ground that it tended to vary the terms of the written guaranty. Now no rule of law is better established than that "parol contemporaneous evidence is admissible to contradict or vary the terms of a valid written instrument." But does the evidence offered do this? The words "upon

completion of well now drilling on Barber farm'' contain
a latent ambiguity. We have already shown the contrariety
of opinion between the plaintiff and defendants as to their
meaning. This court has many times said that in case of latent
ambiguity in a written instrument, parol evidence is admissi-
ble, not to contradict or to add to it, but to explain it. In
*Belcher* v. *Big Four Coal & Coke Co.*, 68 W. Va. 716, 70 S.
E. 712, the owner of coal had made a written lease of it upon
a royalty of $1.50 per ''railroad car, or its equal of coal.''
The railroad cars in use at that time in that region varied in
capacity from 30000 pounds to 60000 pounds; they were
later increased to 100000 pounds capacity. In a suit for
accounting for royalties in that case, Judge Williams said:
''In the present case, wherein a latent ambiguity appears,
even the parol declarations of the parties to the contract,
made at the time of, and prior to the execution, are admis-
sible to prove what size of railroad cars was intended.'' To
the same effect is *Johnson* v. *Burns*, 39 W. Va. 658, 20 S. E.
686; *Brent* v. *Richards*, 2 Gratt. (Va.) 539; and in *Snider*
v. *Robinett*, 78 W. Va. 88, 88 S. E. 599, this court held:

> ''To enable the court to construe a deed or other
> writing, ambiguous on its face, it is always permis-
> sible to prove the situation of the parties, the circum-
> stances surrounding them when the contract was en-
> tered into and their subsequent conduct giving it a
> practical construction, but not their verbal declara-
> tions. But if a latent ambiguity is disclosed by such
> evidence, such for instance as that the terms of the
> writing are equally applicable to two or more objects,
> when only a certain one of them was meant, then prior
> and contemporaneous transactions and collections of
> the parties are admissible, for the purpose of identi-
> fying the particular object intended.''

In the present case, there were two objects, to either of
which the guaranty might apply, namely, ''completion of
well'' under the company's contract, that is, completion by
drilling through the Berea Grit sand and cleaning it out; or
completion of the well as claimed by plaintiff, that is, by

not only doing what was required under the company's contract but also doing all the extra work. We think this statement under the authorities was admissible. It does not contradict nor add to nor vary the written terms; it merely explains what they mean, or at least tends to do so, and to limit defendants' liability to the amount due when the well was drilled through the Berea Grit.

However, it can hardly be contended that when the guaranty was signed, the parties then contemplated drilling further than through the Berea Grit. There is where they expected to find oil; drilling through that sand was provided for in the company's contract. All the parties knew that. The balance of the moneys had not been placed in bank as provided in the company's contract, and it was unable to comply with that provision. The guaranty was accepted in lieu of that. This is candidly admitted by plaintiff. That covered only the money necessary to complete the well through the Berea Grit, that is, the moneys then unpaid on the work and what remained to be done. If the guaranty was substituted for that money, then it only covered the cost of "completion of well" through the Berea Grit and would not bind the guarantors to pay for work done beyond that. Viewed in the light of all the circumstances, we think this is a reasonable and fair interpretation. But defendants' counsel urge in their brief another reason for the admission of this testimony. They say in effect that the consideration for the guaranty so far as Henderson was concerned was that he was to do two things, namely, (1) complete the well according to his contract with the company, and (2) apply all payments received by him from the company in discharge of the guaranty. The guaranty on its face does not recite any consideration. It was clearly competent for either party to prove the consideration or lack of it. Plaintiff says that the consideration was his completion of the well; defendants say that was only part of it; that in addition to completing the well under the company's contract, he was to apply all payments made in discharge of the guaranty. Proof of the one no more contradicts or varies the guaranty than proof

of the other or of both. If one can be shown, so can both. It is clear that the true consideration can be shown. "In a suit to enforce a vendor's lien reserved in a deed for land either party thereto may prove against the other the true and actual consideration upon which the deed is founded, though a different consideration be expressed in the deed." *Baughman* v. *Hoffman*, 90 W. Va. 388, 110 S. E. 829. We hold, therefore, that defendants should have been permitted to show the consideration, and if their testimony is to be believed, the guaranty has been discharged. This should have been submitted to the jury.

We think the court was correct in holding that the guaranty is absolute, and that plaintiff was not required to show insolvency of the principal debtor or his inability to collect from it.

But error was committed in allowance of application of the payments made. Plaintiff testified that the work done after April 2, 1921, amounted to $1461.75; this, of course, included some little work done in drilling in the well, that is, drilling through the Berea Grit, approximately 10 feet, at a cost of $37.50. He also says he applied the $2500 check to the payment of the item of $1461.75, the sum of $449.50 on the part of the old debt for which he says he had no guaranty, and the balance of $588.75 he applied on the guaranty. There are some charges which vary the account slightly, but if he is allowed therefor, his account for completing the well through the Berea Grit would stand substantially as follows:

1921

| | | |
|---|---|---:|
| Jan. | To 1 day 12 hrs. working on rig.....$ | 50.00 |
| Feb. 14 | To 1 day 12 hrs. putting in sand reel. | 50.00 |
| Mar. 11 | To 1 day 12 hrs. pulling 6⅝ casing & helpers ...................... | 88.00 |
| Mar. 18 | To 1 day 24 hrs. running 6⅝ casing & helpers ...................... | 136.00 |
| Mar. 21 | To 1 day 12 hrs. pulling 6⅝ casing & helpers ...................... | 85.00 |
| Apr. 2 | To 2090 ft. drilling @ $3.75........ | 7837.50 |

| Apr. | 5 | To approximately 10 ft. drilling through Berea Grit and cleaning out @ $3.75 | 37.50 |
| | | To 114 ft. reaming @ $3.75 | 427.50 |
| | | To Belt purchased at Clendennin | 65.00 |
| | | To 65/8 casing shoe | 13.00 |
| | | Total | 8789.50 |

Now prior to April 2, 1921, he had been paid $3500, so on April 2nd, the company owed him $8789.50 less $3500, theretofore paid, and also less the sum of $37.50, the unearned part of the drilling price, or $5252.00, or $449.50 more than the amount of the guaranty. Adding the $37.50, for drilling the well in, to $5252, the amount owing on April 2nd, makes $5289.50, the amount owing on completion of the well under the company's written contract. We see, therefore, that Henderson in estimating the amount when the guaranty was signed was in error to the amount of $487.00. Bear in mind that when the well was drilled in on April 5th the company owed Henderson $5289.50; he makes a charge thereafter of $50.00 per day for bailing and cleaning out on the 5th, 6th, 7th, 8th and 9th. The well was not shot till the 6th, and as the well was to be bailed and sand-pumped before it was completed under the contract, we doubt whether he would be entitled to any extra pay for bailing on the day it was drilled in, that is, on the 5th. But assuming that his charges for these five days for extra work are correct, they make $250. This added to the amount due "on completion of well" makes $5539.50, the amount owing when the $2500 check was paid. This check was applied by the debtor—"on account of drilling well at Cottageville," and reduced the amount owing to $3039.50. The creditor had no right to apply any part of it to payment of work done thereafter. *Donally* v. *Wilson*, 5 Leigh 329; 2 Am. & Eng. Ency. Law, 441. The debtor had a right, in the absence of any agreement, between Henderson and the guarantors, to make its own application, so whether there was or was not any specific agreement or understanding between plaintiff and defendants

relative to the application of payments that might be made by the company, the company had the right to make its own application, and it did so. This reduced the account on April 13th to $3039.50. But the account as it stood before payment of the $2500 check included two debts, the balance on the written contract for drilling the well, or $5289.50 and the $250 item for the extra work. Could Henderson apply the $2500 check to the payment of the $250 item and credit the balance on the debt due when the well was completed? We do not think so. He applied $449.50 of it on the "old account," that is the $5252, leaving a balance of that item of $4802.50, the amount of the guaranty. He next credited it on the items for extra work done, which, of course, included the item of $250, and applied the balance on the $4802.50, reducing the latter amount by $588.75; which left it at $4213.75. Under the authorities the whole of the $2500 should have been credited on the account of $5539.50, paying the items in that account in their order of due date. Barbour's Law of Payment, p. 440. But if that were not a rule of law, we think the debtor made such application, and the creditor could not split the payment into two or three payments, apply part to the payment of the "old account," for which he thought he had no security, another to the extra work for which he admits he had no security, and the balance to the remainder of the "old account" for which he had security. Therefore, the $2500 check should have been applied as a whole to the account as it stood when payment was made, that is, when it was $5539.50, and to the items in the order of their due date, but when this is done it effects a reduction of the debt due when the well was drilled through the Berea Grit, in other words, on its completion, and no part is applied to the $250 item. That reduced that debt to $2789.50. There was thereafter paid and credited thereon $2600, reducing the amount due to $189.50. Is this amount recoverable off the defendants? That depends upon whether the plaintiff agreed, as a part of the consideration for their execution of the guaranty, that when payments were made he would apply them to the payment of the debt guaranteed.

If he did not, they would, on this record, owe him $189.50; if he did, they would owe him nothing.

After the evidence was introduced, defendants made a motion to direct a verdict in their favor, and at length, assigned on the record two grounds, not necessary now to discuss, in view of our opinion. After the court overruled the motion, which we think he should have done, he gave three oral instructions to the jury, which in effect, told the jury that if the plaintiff had shown that he had a claim against the Paramount Oil & Gas Company for the money due at the completion of the oil well, they should find for him in that amount. Defendants complain on two grounds: First, that it is incorrect, as a matter of law, and in this contention we think they are right; and, second, that oral instructions given by the court, even if correct in point of law, are contrary to statute, Barnes' Code, 1923, ch. 131, secs. 22-25, Acts 1915, ch. 72. This statute is substantially the same as chapter 38, acts 1907. In *State* v. *Clark*, 64 W. Va. 625, 63 S. E. 402, we held the latter statute mandatory, but refused to reverse the case, because the defendant did not object to the modification of his instruction in proper time, hence his right was waived. The statute reads as follows: (Section 22),

"Upon the trial of any case, civil or criminal, before a jury, either party may pray the court to give to the jury any instruction which has been reduced to writing and submitted to the other party. Such other party may object to the giving of such instructions. Every such instruction which shall propound correctly law applicable to the case not covered by other instructions, shall be given by the court to the jury as part of a written charge by the court to the jury, as hereinafter provided, in case such charge be given as an independent instruction. The court may, on its own motion, whether requested or not, in writing define to the jury the issues involved and instruct them on the law governing the case, but all such instructions shall first be submitted to counsel upon each side with opportunity to object thereto.

In lieu of the giving of separate instructions as herein provided the court may instruct upon the law gov-

erning the case, putting such instructions in the form of an orderly and connected charge, incorporating therein the substance and, as far as may be, the language of the instructions prayed upon either side or prepared by the court on its own motion, with correctly propounded law applicable to the case, which shall first be submitted to counsel upon each side with opportunity to object to any specified part thereof. No objections shall lie to the action of the court upon any instruction if the law to which it relates shall have been correctly stated by the court in such charge. The action of the court upon every instruction prayed, whether such instruction be given as asked or as modified, independently or as part of the court's charge, or be refused, shall be noted upon the margin thereof by the judge over his initials. Either party may except to any and every ruling by the court adverse to the prayer or objection by him with respect to any such instruction.''

The practices prevailing in some of the trial courts of this state which prompted the enactment of this statute are well known to the members of the bar. Whether it be wise or otherwise is not for us to say. It is the law governing all courts in this state in the trial of cases before a jury. To hold it merely directory would be in effect to repeal it. Before it was enacted, the courts had the right to do what it says now they shall do, and it clearly meant to give the trial court no right to give oral instructions governing the matters in issue. It made no difference that what the court said in this case was at the time reduced to short-hand notes by a reporter. Counsel should be given the right accorded by the statute of reading the instructions before they are given. Other states have similar statutes, and their courts hold this view. See: *Bradway* v. *Waddell,* 95 Ind. 170; *Illinois etc. R. Co.* v. *Hammer,* 85 Ill. 526; *Swartwout* v. *R. R. Co.,* 24 Mich. 389; *Doggett* v. *Jordan,* 2 Fla. 541; *Box Co.* v. *Lumber Co.,* 99 Tenn. 122, 41 S. W. 351. It was therefore error to give such oral instructions.

A few minor matters need to be noticed. Testimony touch-

ing delay in completing the well, necessitating extra cost of fuel, was improper; likewise, testimony as to plaintiff's loss of profits because he was not permitted to drill the second well. There is nothing in the pleadings which warrants the introduction of this testimony. The letters from the company to plaintiff, respecting the payments made, were relevant and they were properly admitted.

The written instruction given on behalf of plaintiff respecting the application of payments should have been rejected. He had no right to make application of the $2500 check; that right was exercised by the debtor. Plaintiff could and did make application of the $2600 payment, but to his prejudice. While the instruction may be correct as an abstract statement of law, it tended to mislead the jury. The instructions offered by defendant will not be offered by them in their present form upon a new trial; this is apparent, hence we need not comment upon them.

For the foregoing reasons, we reverse the judgment, set aside the verdict and award a new trial.

*Reversed and remanded.*