# CHARLESTON.

W. C. REDDEN *v.* GLADE CREEK COAL & LUMBER COMPANY

(No. 6024)

Submitted January 31, 1928. Decided February 7, 1928.

1. EVIDENCE—*Parol Evidence of Parties' Situation and Negotiations and What Was Done Under Written Contract Required Delivery of Logs at "Reasonable Rate" Held Admissible.*

   Where, in a written logging contract the parties agree that the logger shall deliver the logs at a "reasonable rate" under penalty of having his contract terminated together with loss

of 10% of the monthly payments made pending the perform-
ance, agreed to be retained until the completion of the work,
and no time for completion is fixed by the contract, the cir-
cumstances under which the contract was made and the situa-
tion of the parties, may be shown by parol testimony includ-
ing the negotiations made before and at the time of the
contract, and what was done by the parties under it, in order
to ascertain the true meaning of the words "reasonable rate"
as used by the parties.   (p. 139.)

(Evidence, 22 C. J. § 1600 [Anno].)

2.  LOGS AND LOGGING—*Instruction That Delivery of Logs as
    Speedily as Possible Satisfied Contract Requiring Delivery
    at "Reasonable Rate," Without Evidence Showing Mean-
    ing Thereof, Held Error.*

    In such case, without such evidence before the jury, it is
    error to instruct it that if the logger in the performance of
    the contract used such energy and equipment as he possessed,
    and that he delivered the logs as speedily as he could con-
    veniently do under the circumstances, then he had delivered
    the logs at a reasonable rate under the contract.   (p. 146.)

    (Logs and Logging, 38 C. J. § 86.)

    (NOTE:  Parenthetical references by Editors, C. J.—Cyc. Not
        part of syllabi.)

Error to Circuit Court, Raleigh County.

Action by W. C. Redden against the Glade Creek Coal &
Lumber Company.   Judgment for plaintiff, and defendant
brings error.

*Judgment reversed; verdict set aside; new trial awarded.*

*Dillon, Mahan & Holt,* for plaintiff in error.
*J. O. Hutchinson* and *Ward & Sanders,* for defendant in
error.

LIVELY, JUDGE:

This writ brings up for review a verdict and judgment for
$1,073.32 in favor of plaintiff Redden against Glade Creek
Coal & Lumber Company (hereinafter called the Company),
on a logging contract.   Redden is a logging contractor, and
the company manufactures lumber from timber owned by it
on Glade Creek in Raleigh County.   A written contract was
entered into by them on September 15, 1922, by which Red-

den agreed to fell and cut into logs the merchantable timber on the east water shed of Glade Creek from the railroad crossing near its mouth to the mouth of Polls Branch, and deliver the logs to within sixty feet of the company's railroad at $6.00 per thousand feet, log measure, payments to be made on the 15th of each month for the timber delivered the preceding month, except 10% which was to be retained until the contract was finished. The measurement of the logs was to be made at defendant's mill by its scaler by Doyle rule. It was provided that should Redden fail to deliver logs at a "reasonable rate" defendant company reserved the right to go upon the property and deliver the remaining timber and charge the additional expense to Redden and that he, Redden, should forfeit the retention money (the 10% retained by the company until the completion of the contract). After performance of the contract began it was agreed that the measurement of the logs should be at the place the logs were delivered along the railroad to avoid confusion with other logs at the mill cut by other persons. It seems that the railroad had not been constructed through the timber embraced in the contract at the time of the contract, but had been graded only; and that other loggers had contracts for cutting logs beyond the territory embraced in Redden's contract (that is above the mouth of Polls Branch), which logs would be hauled out over the railroad when extended to the other outlying territory. Glade Creek lies between mountains with precipitous sides running down to the creek. The water shed embraced in plaintiff's contract lying on the east side and below the mouth of Polls Branch was steep, and the method of delivering the logs to within sixty feet of the railroad (which was partially constructed up the creek), was by rolling or sliding the logs down the hillside called in the woodman's vernacular "ballhooting". It appears that after the railroad was completed through the tract, the contract was still being carried out and this "ballhooting method" used by plaintiff caused damage to the railroad. The logs would not always stop rolling or sliding before they reached the railroad but would be projected upon it causing damage and delay. Between the 1st and 15th of May, 1923, the log road

was constructed through that part of the tract which was then being cut by plaintiff and the logs therefrom damaged the railroad so that it could not be used to deliver logs to the mill from territory beyond the place of injury. Defendant, claiming that it was necessary for the operation of its large mill to have the logs from the territory beyond the places of injury and obstruction in order to meet the demand for logs at the mill, (which had a capacity of about 30,000 feet per day), ordered plaintiff to cease "ballhooting" the logs. Thereupon, plaintiff practically ceased his cutting. At that time he had been cutting about seven and one-half months, and had cut about one-half of the timber. In the meantime, from September, 1922, to about the middle of May, 1923, he had cut and delivered many logs, and had been advanced sums on the estimates, defendant retaining 10%. In September, 1923, an attempt was made at settlement which failed because plaintiff insisted that he had delivered more logs, and hence more feet of lumber, than defendant had given him credit for by its measurement. Defendant would not settle nor pay any further sums, and then this suit began. Plaintiff claimed that he had cut and delivered 2,692 logs and that each log would average 150 feet, making in all 403,800 feet, and that defendant had paid for 297,071 feet, which left a balance coming to him of $640.38 calculated at $6.00 per thousand. This sum, $640.38, together with 99 logs yet in the woods and not removed amounting to $89.10, and for fifteen logs which had gone beyond the railroad grade into the creek and washed away and for which he claimed $13.50, making the principal amount for which the suit is brought, not including the retention of $178.24 and the interest on the claim amounting to $202.25. Defendant, according to its testimony, had received 2,141 logs at the mill which had been scaled by its scaler in accordance with the contract and which amounted to 297,071 feet actual measurement and for which it had paid plaintiff. Thus it will be seen that 551 logs were unaccounted for and the first assignment of error is based on this controversy. The first assignment is that the verdict is excessive. It is conceded by defendant that the jury had the right, under the evidence, to find that

551 logs had not been accounted for. Plaintiff said he had cut these logs delivered them to the railroad and that they had been removed by defendant to its mill, while defendant claimed that it had only received 2,141 logs at the mill, which logs had been measured according to the contract and accounted for. But it is contended by defendant that even if the 551 logs were actually received at the mill and had not been measured, plaintiff's estimation of the amount of feet in these logs at 150 feet per log is a mere guess. It is pointed out that 2,141 logs by actual measurement amounted to 297,071 feet and that this actual measurement should be used for the computation of the average amount in each log instead of the estimated amount fixed by plaintiff at 150 feet per log. It may be that such would be the better method for computation if the jury believed the measurements made by the scaler were correct and that the logs unaccounted for were average logs with those accounted for; but it will be observed that no instruction was offered to the jury pointing out any rule or method of weighing the evidence in that regard; and we cannot say, as a matter of law, that the jury has misconceived or misapplied the principle of law contended for.

Defendant plead the general issue and filed a plea of recoupment, which plea is to the effect that under the contract plaintiff was to cut the timber and deliver the logs at a reasonable rate and failure on his part to deliver the logs at a reasonable rate entitled defendant to go upon the property and deliver the remaining timber and charge additional expense to plaintiff, and retain the retention money; and that plaintiff had failed to deliver the logs at a reasonable rate; that defendant had thereupon gone upon the property and cut and delivered logs to the railroad at an additional expense of $2.00 per thousand feet and was entitled under the contract to retain the 10% reserve, called in the contract the retention money. Issue was joined on this plea and this issue furnishes the main part of the controversy. The points of error in relation thereto are: (1) the giving of plaintiff's instruction No. 1 with respect to the meaning of "reasonable rate" as contained in the contract; and (2) the rejection of evidence offered on the part of defendant for the purpose of

showing the meaning of the words "reasonable rate" as used in the contract.

The paragraph of the contract which is the storm center of controversy is as follows: "Should the parties of the second part fail to deliver logs at a reasonable rate, the party of the first part (defendant) reserves the right to go upon the property and deliver the remaining timber and charge the additional expense to the party of the second part (plaintiff), and the party of the second part shall forfeit the retention money." It appears that defendant owned, or had the right to cut for its mill, a vast amount of timber on the waters of Glade Creek lying above and beyond the portion embraced in plaintiff's contract, through which it had graded its way for the railroad at the time the contract was made; that is, it had graded its railroad through that part of its timber lands embraced in plaintiff's contract which extended up Glade Creek as far as the mouth of Polls Branch. At the time of the contract other loggers were operating above the mouth of Polls Branch, cutting, and delivering on the route of the proposed railroad a vast number of logs for the purpose of furnishing an adequate supply to keep the mill in operation when the railroad was completed. If by any means the railroad was obstructed or destroyed between the mill and the vast lumber operations above the mouth of Polls Branch, the logs from that section could not be furnished to the mill in order to keep it going. It will be observed that the contract between plaintiff and defendant is not limited in time; that is, no time is fixed in which the logs were to be cut and delivered. Defendant, by its witness Perdew, who was Superintendent at the time the contract was made and through whom it was made with plaintiff, and who at the time of his testimony was no longer with defendant company, proffered to show that these circumstances and situations were known to plaintiff at the time of the contract, and that plaintiff was informed that the logs must be cut and delivered expeditiously in order to preserve the free operation of the railroad when laid, and that plaintiff promised to put at least two crews of four men in the woods to expedite the work with the view of having it finished before the railroad operated through that

territory. This was for the purpose of explaining what was meant by the phrase, "deliver logs at a reasonable rate." Perdew was permitted to detail partially what took place between him and plaintiff at the time of the contract and the understanding with reference to the expeditious completion of the contract for the reasons above mentioned, but afterwards upon motion of plaintiff's counsel the court struck out the evidence of Perdew in that regard and instructed the jury not to consider it. And at the conclusion of the evidence the court gave plaintiff's instruction No. 1 to the effect that "reasonable rate" as found in the contract meant that if the plaintiff in performance thereof, used such energy and equipment as he possessed for the cutting and removal of said timber, as speedily as he could conveniently do under the circumstances, then that he delivered said logs at a reasonable rate under the contract and defendant was entitled to no damage with reference thereto. It might be well to here quote that instruction, which is as follows:

> "The Court instructs the jury, even though you should believe from the evidence in the case that the plaintiff, under his contract with the defendant, was to deliver the logs in question as provided in said contract at a reasonable rate, then the Court instructs the jury that if you further believe from the evidence that the plaintiff, in the performance of said contract, used such energy and equipment as he possessed for the cutting and removal of said timber, and that the said plaintiff cut and delivered said logs using such energy and equipment as he possessed therefor, as speedily as he could conveniently do under the circumstances of the case, then the Court instructs the jury that he delivered said logs at a reasonable rate under said contract, and you should allow the defendant no damage with reference thereto."

A rejection of witness Perdew's testimony and the giving of this instruction are closely related and will be considered together. They form the basis of errors Nos. 2 and 3. Plaintiff testified Perdew wanted to fix a time limit for the delivery of the logs, but he (plaintiff), did not know what kind of a

winter it would be, and whether the weather would delay the performance, and would not agree to a time limit. It is quite evident that "reasonable rate" was put in the contract to meet that situation. As it is used in the contract without reference to the circumstances which surrounded its making and the intention of the parties in using it, it is ambiguous. What would be a reasonable rate for delivery of any commodity would depend upon the circumstances which brought about the contract. It is quite generally settled that parol evidence may be used to explain the meaning of expressions of this kind which are plain within themselves, but which are uncertain when applied to the matter about which the parties are contracting. Jones on Ev., 2nd ed., p. 2835, sec. 1552; and sec. 1559 as to negotiations and statements of parties. The reason for the admissibility of parol evidence is well stated in 10 R. C. L., p. 1071, sec. 266, as follows:

> "Parol evidence is proper to explain the meaning of words, letters or figures used in a writing which are ambiguous when applied to the subject matter, as well as when the meaning of the writing is uncertain looking only at the language thereof. And an ambiguity in a written contract calling for construction may arise as well from words plain in themselves, but uncertain when applied to the subject-matter of the contract, as from words which are uncertain in their literal sense. * * * So, also, in an action on a written contract for stone at a specified price 'per perch', the contract not specifying the number of cubic feet in a perch, and the evidence on that point being conflicting, parol evidence of the oral negotiations and agreement of the parties is admissible to explain the ambiguity. Again, where a party contracts to take goods currently, parol evidence is admissible of a conversation between the parties at or before entering into the contract concerning the word 'currently.' "

In our case of *Belcher* v. *Coal & Coke Co.*, 68 W. Va. 716, the contract provided that plaintiff should have as royalty on his coal $1.50 per railroad car or its equal of coal. Railroad cars for the hauling of coal in that vicinity had capacities ranging

from 30,000 to 60,000 lbs., and it was necessary to explain what capacity of car was contemplated by the parties when they used the words "railroad car, or its equal of coal." And it was held that for the purpose of arriving at the correct intention of the parties, parol evidence was admissible, not for the purpose of adding to, contradicting or varying the terms of the instrument, but for the purpose of explaining the ambiguity and it was said that in that case wherein a latent ambiguity appeared, even the parol declarations of the parties to the contract made at the time of and prior to the execution were admissible to prove what size of railroad car was intended. Citing *Johnson* v. *Burns,* 39 W. Va. 658; 4 Wigmore Evi., sec 2472, and other authorities. The same principle was applied in *Whitaker-Glessner Co.* v. *Brick Co.,* 86 W. Va. 621, wherein the contract was ambiguous in its terms and the court said: "Where the character of the contract is such as the one involved here, the court will look at the subject matter thereof, the situation of the parties and the surrounding facts and circumstances, in aid of its proper construction, including the negotiations leading up to the contract, if that be necessary:" The same principle is enunciated in *Shenandoah L. & A. Coal Co.* v. *Clarke,* (Va.) 55 S. E. 561, and *Pine Beach* v. *Columbia Amusement Co.,* (Va.), 56 S. E. 822. In the latter case it was said:

> "If the previous negotiations make it manifest in what sense the terms of the contract are used, such negotiations may be resorted to as furnishing the best definition to be applied in ascertaining the intention of the parties. The sense in which the parties understood and used the terms of the contract is thus ascertained. To explain the meaning of a writing in the true sense, and with this limit, is to develop the real meaning of the document. The admission of parol evidence for this purpose does not violate the rule which makes the written instrument the proper and only evidence of the agreement." (Citing authorities).

Under these authorities and this well recognized exception to the general rule that parol evidence of negotiations is

not admissible with respect to written contracts, we conclude that the trial court erred in refusing Perdew's evidence, which would have tended to explain the meaning of "reasonable rate" as used in the contract. It follows that the instruction which told the jury in substance that reasonable rate should be interpreted from the standpoint of plaintiff and his conveniences and facilities for carrying out the contract was erroneous. It practically denied the defendant any benefit which the jury might give to it on its plea of recoupment·under the whole evidence and circumstances of the case.

For these errors the judgment will be reversed, the verdict set aside and a new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*